No. 46,994

ALOIS BINDER and ROBERT BINDER d/b/a ALOIS BINDER AND SON, *Appellees*, v. D. R. PERKINS, *Appellant*.

(516 P. 2d 1012)

Opinion filed December 8, 1973.

*Charles Boyle,* of Russell, argued the cause, and was on the brief for the appellant.

*Norbert R. Dreiling,* of Dreiling and Bieker, of Hays, argued the cause and *Dennis L. Bieker,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

OWSLEY, J.: Defendant Duane R. Perkins, operator of an aerial crop-spraying business, appeals from a judgment against him of $2,500 plus costs for loss of plaintiffs' leased five and one-half acre

alfalfa field damaged by airborne 2-4D herbicide applied by defendant to a neighboring wheat field.

Carl and Alphonse Ruder contracted with defendant to spray their seventy-acre wheat crop south of Hays, Kansas, to kill weeds. The job was contracted on June 15, 1969, about a week before wheat harvest was to begin. It was determined by Ruders and Perkins that a heavy application of low volatile 2-4D Ester herbicide would be necessary to cause the weeds to wilt and droop below the heads of wheat and below the cutting bar by harvest time.

On June 19, 1969, defendant and his pilot, Harry Vann, determined the atmospheric conditions were suitable for aerial spraying of Ruders' wheat field. The wind was out of the southwest blowing toward the northeast and spray released over Ruders' wheat field would drift east and north over Ruders' land. Defendant's pilot had previously located Ruders' field from the air and informed Perkins of the existence of a small alfalfa field adjacent to the wheat field to the west. 2-4D is a selective herbicide which kills broad-leafed plants such as weeds, but does no harm to narrow-leafed plants like wheat. Unfortunately, alfalfa and other broad-leafed crops are also susceptible to the killing effects of this herbicide. Defendant was well aware of this danger and for that reason he testified he was careful to have his pilot apply the spray at such time and in such manner that it would not fall or drift westward onto the alfalfa field.

Defendant was not present during the spraying. Defendant's pilot, Vann, testified he applied one pound of 2-4D low volatility Ester mixed with one-half gallon diesel oil per acre to the seventy-acre wheat crop. He flew a north-south pattern beginning at the eastern edge of the wheat field and working west. Though no flagman was employed by defendant to signal the pilot when and where to begin and cease spraying, he testified he did not pass over the alfalfa field because to do so he would have had to maneuver the plane over or under a wire. The pilot testified he could see the boundaries of the wheat field clearly and did not need a flagman; that he applied the spray mixture from an average altitude of four to six feet; and that he periodically checked the wind direction and the spray did not drift over plaintiffs' alfalfa field.

The parties stipulated that federal government weather reports from Hays and Russell airport weather stations were proof of weather conditions during and subsequent to the spraying. The

weather reports reflect the wind remained constant out of the southwest all of June 19, 1969, the day the spray was applied; and that by 7:00 a. m. June 20, 1969, the wind had shifted from southwest to northeast, continued to shift to the east, and by night was again blowing from a southerly direction. Wind blew across the newly sprayed wheat toward plaintiffs' alfalfa for at least part of that period. Experts testified the spray mixture on the wheat could reasonably be expected to give off fumes for two or three days after application of such a strong mixture of 2-4D. Plaintiffs contend fumes from the evaporating spray drifted on the wind from the wheat field onto the alfalfa field and killed the plants. They contend defendant was negligent in applying such a strong mixture of a volatile herbicide knowing the wind might shift before it was completely evaporated and blow fumes onto adjoining crops.

Plaintiff Alois Binder testified he noticed the alfalfa plants wilting on June 23, 1969, and suspected spray or chemical damage even though unaware the Ruders' field had been sprayed. After determining no one else had sprayed in the area, plaintiffs notified defendant of the injury to their alfalfa on June 24, 1969. Plaintiffs cut the standing alfalfa on June 25, 1969, to attempt to mitigate the effects of the 2-4D on the roots of the plants. Agronomy experts testified the alfalfa had no blight or other disease which would have caused its deterioration. The alfalfa was two weeks from maturity of the second crop and no more crops were harvested during 1969. Plaintiff Robert Binder testified alfalfa plants covering two-thirds of the field eventually died or were badly damaged with heaviest damage adjacent to the Ruders' wheat field, and they plowed under the alfalfa because one-third of the five and one-half acre field was not an economically productive unit. Plaintiffs planted milo in the field in 1970, but did not plant a crop in 1971 and instead controlled weeds to conserve moisture in the soil. Alfalfa was seeded in the fall of 1972 and light yields were expected by 1973 and 1974. Plaintiffs estimated their losses in 1970, 1971, 1972, 1973, and 1974 at $677 per year and half that for 1969. Their evidence of damages amounted to $3,113.97, but their petition was for $2,500 plus costs and the court so limited the judgment.

The issues raised by defendant's points on appeal are basically these: (1) Whether the court applied the proper law of standard of care to defendant's aerial spraying activities; (2) whether plaintiffs have standing to bring a cause of action for all damages sus-

tained to the leased property; and (3) the proper measure of damages to crops and perennial plants.

On the question of defendant's liability and the standard of care applicable to an aerial sprayer of herbicides, the court found:

"The degree of care must be equal to the danger involved. 2-4D is a dangerous instrumentality. It destroys certain types of growing plants on contact, including alfalfa.

"Handling of 2-4D is a hazardous activity for this reason, and one handling 2-4D has the duty to prevent its escape so as to cause such damage.

"The evidence shows that here there was a high concentration of 2-4D and in a preparation resulting in a high degree of volatility to be applied to weeds of large and advanced growth and on a field of wheat headed out and within about a week of the time of harvest, all conditions which would further tend to prolong the evaporation period.

"The evidence shows conditions under which this evaporation and escape of 2-4D could reasonably be expected to continue for two days and more after application.

"The defendant knew the position of plaintiff's alfalfa field. The evidence showed the wind changed within 24 hours to East of North and continued briskly from the East for another 24 hours and more. And in Kansas, that should reasonably have been expected.

"The court finds from a preponderance of evidence the defendant negligently permitted the 2-4D to escape from the Ruder land where applied by defendant into contact with the plaintiffs' growing alfalfa, and this was the proximate cause of destroying the plaintiff's alfalfa field."

The standard of care required of one who engages in aerial spraying of chemicals is a question of first impression for this court. In *Hall v. Pioneer Crop Care, Inc.*, 212 Kan. 554, 512 P. 2d 491, a cause of action in trespass was successfully maintained against an aerial spraying company for accidental destruction of plaintiffs' trees by spraying with brush killer. We do not interpret *Hall* to limit the victim of aerial spraying of chemicals to a cause of action based upon trespass. In that case the choice of trespass was made because defendant actually penetrated plaintiffs' airspace and the criminal trespass statute (K. S. A. 21-2435, since repealed) allowed plaintiffs to recover treble damage for destruction of trees.

Plaintiffs contend defendant was negligent in applying the strong mixture of 2-4D which extended the evaporation period during which neighboring crops were exposed to the risk of drifting fumes. Plaintiffs further contend it was foreseeable to defendant that a change in wind direction could occur during the extended risk period. The trial court concurred in these contentions and we find

no error of law or lack of evidence to support the trial court's conclusions on liability.

Defendant contends the trial court applied strict liability or liability without negligence to his activities in determining agricultural chemicals were a dangerous instrumentality and handling them was a hazardous activity. We find no merit to that contention since the court made specific findings of negligent acts. We should not apply a rule of strict liability without fault since the legislature has endorsed a policy of requiring liability based upon negligence. Statutes require owners and operators of aerial spraying equipment to post bond or liability insurance to pay for damages due to their negligence (K. S. A. 3-904, now K. S. A. 1972 Supp. 2-2423). The duty of care imposed upon the crop sprayer, however, is a matter for the courts, and the trial court in this case has characterized 2-4D as a dangerous instrumentality, handling of it a hazardous activity, and has imposed upon the one handling it a duty to prevent its escape. This is the outline of a high degree of care, not liability without fault. It is no more than an application of the standard stated in *Lobenstein v. McGraw*, 11 Kan. 645, Syl. ¶ 2:

"Every one engaged in any business or occupation must use reasonable precautions to prevent such business or occupation from working injury to others. What are reasonable precautions vary with the character of the business, and the place in which it is carried on. A peculiar hazard calls for increased care; and the greater the risk, the more imperative the obligation."

In this case, the finding that defendant knew or should have known the 2-4D fumes could reasonably be expected to escape for two days following the application, the position of plaintiffs' alfalfa field, and that he knew or should have known of the possibility of a wind shift in that direction, are all supported by the evidence. Knowledge of these facts and the foreseeability of the consequences seems consistent with what should be expected of one who holds himself out as a professional aerial crop sprayer. We find no merit in defendant's contention the court erred in concluding defendant liable for negligence in application of herbicide.

The various theories upon which aerial crop sprayers and hiring landowners are liable for damage to neighboring crops are annotated in 37 A. L. R. 3d 833. See also, Chapman, Crop Dusting—Scope of Liability and a Need for Reform in the Texas Law, 40 Texas Law Review 527, for a discussion of the standard of care applied to aerial crop spraying.

Defendant's other points on appeal are more meritorious. He contends the court erred in assessing damages in two ways. It applied the wrong measure of damages for injury and destruction of a perennial crop and it allowed a lessee to recover damages for a cause of action rightfully in the landowner. The two questions are inextricably intertwined because of the unique qualities of alfalfa and must be dealt with simultaneously.

Damages for injury to an annual crop and for destruction of perennial plants are measured differently. The general measure of damages for destruction of growing annual crops is the value of the crop in its condition at the time and place it was destroyed. (*Sayers v. Railway Co.,* 82 Kan. 123, 107 Pac. 641.) That rule, however, does not accurately reflect the loss due to destruction of a perennial crop which is not quickly re-established within the succeeding growing season. There is authority from other jurisdictions that damages for destruction of alfalfa is measured much like destruction of timber and orchards as damage to the value of the land. (*Morse v .Chicago, B. & Q. R. Co.,* 81 Neb. 745, 116 N. W. 859; *Adam v. Railroad,* 139 Mo. App. 204, 122 S. W. 1136.) While that may be a proper measure of a landowner's damages, it does not supply us with a measure of plaintiffs' damages in this case, since plaintiffs are lessees. In *Mackey v. Board of County Commissioners,* 185 Kan. 139, Syl. ¶ 8, 341 P. 2d 1050, the following language from *Elliott v. Railway Co.,* 8 Kan. App. 191, 55 Pac. 490, was approved as the measure of a lessee's damages:

" 'The plaintiffs' interest in the said land was that of tenants for the season of 1894. The plaintiffs, therefore, cannot recover for any injury to the land itself except so far as it may have affected the value of the use of the land for the term for which they had leased or rented it; and if you find for the plaintiffs, the measure of their recovery will be the difference between the rental value of the land immediately before and immediately after the injury complained of, from March 1, 1894, to March 1, 1895, not exceeding the sum of $480, the amount claimed in the petition.' " (p. 196.)

Confining plaintiffs' damage for the destruction of the alfalfa to the value of the possession of the alfalfa land or the value of their lease before and after the spraying, it was error for the trial court to admit evidence of damage beyond the period of plaintiffs' lease in existence at the date of defendant's wrongful act. Plaintiff Robert J. Binder testified they farmed a total of 1,180 acres of which 840 acres were rented, including the five and one-half acre alfalfa field. They had farmed the land since 1964 under a series of leases

which provided for rent to be one-third of the crop. The lease current June 19, 1969, was placed in evidence and showed Alois Binder to be lessee and Mary C. Nickel, lessor, and was executed April 22, 1969, to expire February 28, 1971. Subsequent leases were placed in evidence and were objected to by defendant as being incompetent, irrelevant and immaterial to the question of plaintiffs' damages. The court erroneously overruled defendant's objection. It was impossible for defendant to injure a right of possession that was not in existence at the time of the wrong-doing. (*Tankersley v. Peabody Coal Co.*, 31 Ill. 2d 496, 202 N. E. 2d 498; *Funston v. Hoffman*, 232 Ill. 360, 83 N. E. 917; 51C C. J. S. Landlord and Tenant, § 354, p. 892.) Therefore, we must reverse this decision and limit the time span of plaintiffs' damages to the time span of the lease current at the time of defendant's negligence and to the years 1969 and 1970.

We must also limit the extent of plaintiffs' recovery by the terms of the lease. Plaintiffs' loss of value of their lease was equal to their share of the net value of the lost crops for those years, or two-thirds of the net income from the alfalfa. In *Edwards v. Solar Oil Corp.*, 177 Kan. 219, 277 P. 2d 614, this court held:

". . . If there has been an unauthorized or wrongful act which causes damages to the interests of a landowner and his tenant each has a cause of action but each may recover only the damage to his own interest. . . ." (p. 223.)

To the same effect is *Sayers v. Railway Co.*, supra, and *Larkin v. Taylor*, 5 Kan. 433.

Plaintiffs testified they lost half the 1969 yield due to destruction of the alfalfa, or $338.50. We must reduce that by the one-third which was the landlord's share. Plaintiffs' loss for 1969 under the terms of their lease would be $225.66. In 1970 milo was planted and the net value for that yield, $41.53, was deducted in mitigation of plaintiffs' damages. The total loss for 1970 was valued at $635.47. We must reduce that by the one-third share of the landlord. Plaintiffs' loss was $423.64 for 1970. We conclude, on the basis of the evidence of damages contained in the record, that plaintiffs are entitled to judgment against defendant in the amount of $649.30 and costs.

Affirmed in part and reversed in part with directions to enter judgment in accordance with the instructions contained herein.