FIRST AMERICAN CARRIERS, INC. and David
Newman *v.* The KROGER COMPANY

89-220                                          787 S.W.2d 669

Supreme Court of Arkansas
Opinion delivered April 16, 1990
[Rehearing denied June 18, 1990.*]

*Sp. J. Bill Bristow would grant rehearing.

*Wright, Lindsey & Jennings*, for appellants.

*Barber, McCaskill, Amsler, Jones & Hale, P.A.*, for appellee.

SEARCY W. HARRELL, JR., Special Justice. On June 8, 1988, an eleven vehicle accident occurred on Interstate 40 east of Little Rock. At the time of the accident, the highway was clouded by smoke from wheat fields being burned by Lonoke County farmers. One of the vehicles was owned by Ryder Truck Rental, Inc. (Ryder), leased by it to First American Carriers, Inc. (First American) and driven by a First American employee, David Newman. Three of the vehicles were owned by The Kroger Company (Kroger), which was insured by CNA Insurance Company (CNA).

On the day following the accident, Ryder retained Roger Glasgow of the law firm of Wright, Lindsey & Jennings (the Wright Firm) to supervise its investigation of the accident and to represent its interest, and that of First American and Newman, in the event of litigation arising out of the accident. Mr. Glasgow immediately became actively involved in the investigation of the accident. On that same day, Edwin L. Lowther, Jr., of the Wright Firm was also contacted by a claims representative for CNA who advised him that vehicles owned by its insured, Kroger, were involved in the same accident and requested legal research on open field burning in Arkansas. Mr. Lowther copied relevant Arkansas statutes on open burning and transmitted them to CNA. The only other contact between CNA and the Wright Firm concerning this accident was a June 13, 1988, telephone request from CNA inquiring if the advancement of funeral expenses would be prejudicial to it in subsequent litigation. Mr. Lowther advised CNA's representative on this issue.

The two attorneys then discovered the conflict, and Mr. Lowther promptly notified CNA and declined further representation. Subsequently, by letter dated July 7, 1988, Mr. Lowther wrote CNA, advised it of Mr. Glasgow's heavy involvement in assisting Ryder promptly after the wreck, and stated "because of the extent of work performed by Roger on Ryder's behalf, we

have no choice but to withdraw as CNA-retained counsel for Kroger Stores." The Wright Firm transmitted a bill for $82.50 with this letter.

There was never any direct contact between any employee or other representative of Kroger and the Wright Firm. There is no evidence that the Wright Firm obtained any confidential information from CNA or Kroger regarding Kroger and this accident.

On June 13, 1988, a lawsuit was filed in the Circuit Court of Lonoke County. Among the named defendants were First American, Newman, and Kroger. CNA retained other counsel for Kroger and during the course of this litigation, Kroger made a motion for the disqualification of the Wright Firm as attorneys for First American and Newman on the basis of a conflict of interest. The trial court granted this motion, from which First American and Newman appeal. The decision is affirmed.

Appellants rely on three points for reversal. They contend: (1) Kroger is not a former client of the Wright Firm regarding this action; thus, Rule 1.9 of the Model Rules of Professional Conduct has not been violated, (2) CNA is not a party to this action and is not being harmed by the Wright Firm's representation of First American and Newman; thus, there is no violation of Rules 1.7 and 1.9 of the Model Rules of Professional Conduct, and (3) the facts of this case do not create an appearance of impropriety; thus, Canon 9 of the Model Rules of Professional Responsibility has not been violated.

The issue presented is whether, under these facts, the trial court properly disqualified the Wright Firm.

The issue presented is difficult because the contacts were solely between the Wright Firm and CNA, the contacts were minimal, there is no evidence that confidential information relating to this litigation was obtained as a result of the contacts, no direct contacts were made between the Wright Firm and Kroger, and the Wright Firm acted promptly in declining further representation of CNA and Kroger.

Rule 1.9 of the Model Rules pertains to the representation of a former client; Rule 1.7 pertains to the representation of an existing client.

Rule 1.9 provides:

A lawyer who has formerly represented a client in a matter shall not thereafter: (1) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or (2) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

Rule 1.7 provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interest, unless: (1) the lawyer reasonably believes representation will not be adversely affected; and (2) the client consents after consultation. . . .

The appellants' points (1) and (2) are closely related, and we will discuss them together.

We have consistently taken strong positions in situations where the public's confidence in attorneys might be eroded by the appearance of a conflict of interest.

It is clear under the Model Rules of Professional Conduct and the prior decisions of this Court that if the contacts had come from Kroger, rather than CNA, then the Wright Firm would have been subject to disqualification. The appellants argue forcibly that the Wright Firm's former client in this case was CNA, and not Kroger, because there was never any engagement by Kroger of the firm's services nor any consultation with Kroger for the purpose of obtaining information concerning the subject of the litigation.

We cannot agree with this argument. There are two

ABA opinions on point. The ABA Comm. on Professional Ethics and Grievances, Formal Op. 282 (1950) states that "[the] essential point of ethics involved was that the lawyer so employed would represent the insured as his client with undivided fidelity. . . ." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1476 (1981) states that ". . . when a liability insurer retains a lawyer to defend an insured, the insured is the lawyer's client." We agree with the principles established by these opinions.

■ It is interesting to note that neither of the Wright Firm's initial contacts came from entities which became parties to the litigation. CNA initially contacted the Wright Firm regarding Kroger, and Ryder did so regarding First American and Newman. This is the nature of the insurance defense law practice. The record is clear that the Wright Firm knew it was being contacted by CNA regarding Kroger's involvement in this anticipated litigation, and it understood that the work was for the eventual benefit of Kroger as a potential party. The Wright Firm's letter to CNA discontinuing representation stated that "[w]e have no choice but to withdraw as CNA-retained counsel for Kroger Stores."

The Rules of Professional Conduct are established so members of the public will have confidence in their attorney. The appellants point out that a party has the right to choose his attorney; however, a party also has the right not to have his prior attorney take a case against him involving that same matter. We believe that Kroger had a reasonable expectation that the Wright Firm was Kroger's attorney in this case. The Wright Firm's continued representation of the appellants would create that appearance of impropriety that the rules and prior decisions of this court require attorneys to carefully avoid.

■ The third point raised by appellants is that there is no appearance of impropriety and thus "Canon 9 of the Model Rules of Professional Responsibility has not been violated." Actually, Canon 9 was a part of the ABA Code of Professional Responsibility and the exact language is not in the Model Rules of Professional Conduct adopted by this court. Canon 9 provided that "a lawyer should avoid even the appearance of impropriety." The fact that Canon 9 is not in the Model Rules does not mean

that lawyers no longer have to avoid the appearance of impropriety.

In *Gipson* v. *Brown*, 288 Ark. 422, 706 S.W.2d 369 (1986), an attorney represented a church with regard to its incorporation. The same attorney later participated as legal counsel and party plaintiff in an action against the church elders seeking financial data and business information. On motion by the elders, we disqualified the attorney based on his prior representation of the church, stating:

> Courts will disqualify counsel in an adversary proceeding when: (1) the moving party was previously represented by the attorney whose disqualification he now seeks; (2) the matters embraced within the pending lawsuit are *substantially related* to the matters or the cause of action on which the attorney previously represented the moving party; and (3) the attorney is representing an adversary of the movant party in the pending suit.

We further stated:

> If the two actions are found to be substantially related, a presumption arises that the former client's confidences were disclosed to the former attorney, which confidences the attorney might use to the detriment of the movant in the current action. . . . The Court will entertain this presumption and will not inquire into the nature and extent of the confidences. The confidential disclosures, whether actual or presumed, necessitate the disqualification of the attorney when he represents an adverse interest in a related matter.

*Gipson* v. *Brown* was decided under the ABA Code of Professional Responsibility, Canons 4, 5, and 9. Canon 4 provided that a lawyer should preserve the confidence and secrets of a client. Canon 5 provided that a lawyer should exercise independent professional judgment on behalf of a client. Canon 9 provided that a lawyer should avoid even the appearance of impropriety. The attorney in *Gipson* v. *Brown* was not disqualified solely because of the appearance of impropriety, but because of the reasons stated in the opinion and quoted above.

We recognize that there may be occasions when there may

be an appearance of impropriety without factual basis. In the case before this Court, the Wright Firm had an actual conflict of interest, and all parties agreed that it would have been inappropriate for the Wright Firm to continue to represent both clients. It is not just the appearance of impropriety but the fact that the Wright Firm accepted both clients, even though innocently, and even though there was no confidential information obtained from CNA or Kroger that would prejudice Kroger. The Wright Firm, during its dual representation, although short, might well have acquired confidential information from Ryder that could be used against Kroger.

While Canon 9 is not expressly adopted by the Model Rules, the principle applies because its meaning pervades the Rules and embodies their spirit. It is included in what the preamble to the Rules refers to as "moral and ethical considerations" that should guide lawyers, who have "special responsibility for the quality of justice." This is why the principle applies here, and not because it was part of the Code.

In *Martindale* v. *Richmond*, 301 Ark. 167, 782 S.W.2d 582 (1990), an attorney received a letter of caution from the Arkansas Supreme Court Committee on Professional Conduct after the committee found that he had violated Rule 1.9. The facts were that in 1982 the attorney was retained to file a divorce suit against his client's wife. The parties reconciled, and the suit was dismissed that same year. The parties subsequently were divorced, but the appellant attorney represented neither of them at that time. In 1987, the former client's former wife retained the appellant attorney to represent her in seeking an increase in child support. On motion of appellant's former client, the husband, appellant was disqualified, and a subsequent complaint was lodged with the Committee on Professional Conduct. Although there was no evidence that the appellant attorney actually had information or confidences from the prior relationship that he intended to use in the support case, we held that "the appearance exists that such an abuse could occur and for that reason, appellant should have declined to represent Adele when he learned that he had represented Richmond earlier."

The current situation meets the criteria set forth in Rule 1.9 and in *Gipson* v. *Brown* and *Martindale* v. *Richmond*. This is the

same matter, and the interests of the appellants and Kroger are adversarial as the issue of relative fault between these parties will be litigated.

Under the rules, Kroger could have waived the conflict but it has specifically declined to do so.

In addition, Rule 1.10 of the Model Rules of Professional Conduct provides that while lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by the other rules.

The violation of Rule 1.9 and the rules set forth in our prior decisions require that this case be affirmed.

Affirmed.

Special Justice CARL A. CROW, JR., joins in this opinion.

HAYS, GLAZE, and PRICE, JJ., not participating.

Special Justice BILL W. BRISTOW dissents.

BILL W. BRISTOW, Special Justice, dissenting. The majority opinion has fairly and succinctly stated the factual background which precipitated the motion to disqualify the law firm of Wright, Lindsey & Jennings (the Wright Firm). In addition, it should be noted that the accident occurred on a Wednesday, that the two lawyers were contacted on the next day, and that the following Monday the firm discovered the potential conflict and immediately notified CNA that it could not represent the CNA insured, Kroger Stores, in the matter. Thus, only one full work day, Friday, elapsed between the time that the insurance carrier contacted Edwin L. Lowther, Jr., and his notifying CNA that he must decline further representation. As noted by the majority, and of paramount importance, no confidential information of any type was obtained by the Wright Firm from CNA or Kroger. Finally, it should be noted that Roger Glasgow, who had been contacted by Ryder, according to the undisputed testimony had been immediately and considerably involved at the outset, which involvement had consisted of meeting with a Ryder representative and a consulting expert and visiting the scene of the accident.

It is the manner in which the majority has applied the Model

Rules of Professional Conduct and the policy considerations implicit in such application which provokes this dissent. The Preamble to the Model Rules contains the following recognition of the practical side of the practice of law:

> In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system and to the lawyer's own interest in remaining an upright person while earning a satisfactory living. The Rules of Professional Conduct prescribe terms for resolving such conflicts. Within the framework of these Rules many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules.

At another point, the Preamble states:

> The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself.

The Preamble also contains a pertinent caveat:

> The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons.

In the instant case the contacts were solely between the Wright Firm and CNA and were minimal in nature, taking place over the span of one work day and parts of two others. Upon discovering the situation, the Wright Firm properly notified CNA that it was declining further representation of Kroger. There was no contact whatsoever between Kroger and the Wright Firm, and absolutely no confidential information was imparted to the Wright Firm from CNA.

What policy basis can require the disqualification of the Wright Firm from representing the interest of Ryder in this fact

situation? The majority analogizes this case to situations where the public's confidence in attorneys might be eroded by the appearance of a conflict of interest. But if one looks at the public's confidence in attorneys, one must consider the impact of this decision on Ryder. On the day after the accident its representatives met with its chosen lawyer and a consulting expert who visited the scene and began supervising defense efforts. Now, Ryder is being told that it cannot have the benefit of further representation of the attorney who orchestrated its original defense strategy because this would erode the public's confidence in attorneys. How does this revelation increase the confidence in the legal system of a client in the position of Ryder?

From the standpoint of the public at large it is difficult to fathom how this decision can be perceived as anything other than one of those endless rules which lawyers constantly argue over. The Preamble warns against the use of the Model Rules as procedural weapons and the commentary to Rule 1.7 notes that disqualification motions can be misused as a technique of harassment. When the only contact is from an insurance carrier and did not impart confidential information, disqualification amounts to exalting form over substance. It can hardly be justified as adding to the public's confidence in the legal system.

If one looks at this by balancing the interests of the respective clients, how has this affected Kroger? They did not talk directly with the Wright Firm. Under their insurance contract with CNA, the carrier typically chooses the defense counsel. As has been repeatedly underscored no confidential information was revealed. Certainly if the respective effects on CNA/Kroger and Ryder are balanced, there is harm to Ryder without corresponding harm to CNA/Kroger.

Finally, how does this decision affect lawyers? If this result is mandated by Rule 1.9, does not a law firm which is retained by CNA have a Rule 1.9 conflict in any instance in which the interest of another carrier is adverse to CNA? Must such firm then withdraw from representing both carriers? When one considers the subrogation claims in the casualty insurance field, the logical extension of such reasoning is that a law firm may only represent one carrier at a time. The effect of such a decision on defense practice, and large law firms, should be readily apparent. It is

submitted that such a result is not intended by the language and policy of Rule 1.9.

Of course, the answer to this problem is that the insured is the defense firm's client from the standpoint of any Rule 1.9 analysis. Yet if this perspective is used in the instant case, the absence of any contact between Kroger and the law firm means that Rule 1.9 can not be the underpinning for disqualification.

As another basis for disqualification, one turns to the question of appearance of impropriety. This is a familiar and oft-quoted phrase but does not actually appear in the language of the Model Rules of Professional Conduct as adopted by this Court. Further, it should not be used to explain the end result of reasoning rather than to explain the exact policies and intricacies of such reasoning. This phrase should not be used as a tool for disqualification when the facts do not justify its invocation. *See International Electric Corp.* v. *Flanzer*, 527 F.2d 1288 (2nd Cir. 1975).

In summary, there simply is no practical reason nor is there a discernible policy behind the decision to disqualify. The effects on one of the litigants, the law firm, the practice of law, and indeed the public are unnecessary and unwarranted. Moreover, the potential mischief for the future in the logical extensions of this reasoning is apparent. For all of these reasons, I respectfully dissent.