Norman L. BURNETTE, d/b/a Burnette Flying Service *v.*
Billy MORGAN

89-351                                                   794 S.W.2d 145

Supreme Court of Arkansas
Opinion delivered July 16, 1990

*Butler, Hicky & Long*, for appellant.

*Easley & Hicky*, for appellee.

OTIS H. TURNER, Justice. This appeal is from a jury verdict awarding $109,256.60 in damages to the appellee, the holder of a leasehold interest. The damages resulted from the drifting of sodium chlorate, a chemical applied aerially to a wheat crop, onto adjacent apple orchards and a peach orchard leased by the appellee.

At the time of the occurrence, in May, 1985, the appellee had about nineteen months remaining on a five-year lease of a fifty-acre apple orchard, which was some two years old. Additionally, he had leased a mature five-acre apple orchard that was about ten years old and a fifty-acre peach orchard that was about three years old.

The appellee sought damages for a loss to the fifty-acre apple orchard from 1986 through 1989. It was, admittedly, a young, non-fruit-bearing orchard in 1985, and thus no damages occurred in that year. He also sought damages for injuries to the five-acre apple and fifty-acre peach orchard for 1985. The damages beyond the 1986 crop year arose from the appellee's exercise of an option to renew the basic lease.

The damage issue, standing alone, warrants a reversal. However, this appeal is further complicated by a conflict-of-interest issue involving counsel for the appellant.

When the damage suit was filed in 1985, the appellant was represented by the law firm of Butler, Hicky and Routon, Ltd. (Butler-Hicky), in which Preston G. Hicky was a partner. Butler-Hicky was retained to defend the claim by Crump Aviation Underwriters, appellant Burnette Flying Service's insurance underwriter that issued the specialized liability coverage for aerial chemical spraying. Crump Aviation Underwriters was a Butler-Hicky client of long standing.

Preston Hicky had been with the Butler-Hicky law firm for fourteen years and a partner sharing proportionately in the firm's income for about thirteen years. From November 1, 1985, the date the answer was filed by Butler-Hicky, the Butler-Hicky firm

represented the appellant in defending this case. Statements for accrued legal fees and expenses were submitted by Butler-Hicky and paid prior to February 1, 1987, with Preston Hicky receiving his proportionate share. During the same period, Preston Hicky made at least one appearance on behalf of the appellant at a docket call, and, though not the lead attorney in the case, he testified that quite possibly he had discussed the facts with Phil Hicky, his partner at the time and the lead attorney representing the appellant.

On January 31, 1987, Preston Hicky left the Butler-Hicky firm and on February 2, 1987, became a partner with B. Michael Easley in the new firm of Easley & Hicky. Easley was at all times the attorney for the appellee in this case.

Prior to trial, the appellant moved to disqualify Easley & Hicky from representing the plaintiff. The court denied the motion. It is important to note that in another unrelated matter, the court, on a similar motion, made findings which directed Preston Hickey not to participate in any manner in the representation by Easley & Hicky in that case, where the case was being defended by Butler-Hicky. While no such findings were made here, the judge entering the order testified on the motion for a new trial that his intent was to prohibit Preston Hicky from participating in *any* matter where the conflict-of-interest question was material.

After the verdict and at a hearing on the motion for a new trial, Michael Easley testified that he was aware that Butler-Hicky had objected to Preston Hicky's participation in the matter. In fact, Easley had requested that Phil Hicky permit Preston Hicky to work on the case and was refused. At *that* time, Preston Hicky, who had an understanding of agricultural issues, was in fact working on the case for Easley & Hicky in preparation for trial.

Preston Hicky testified that he recalled a conversation with Phil Hicky at about the time he left Butler-Hicky in which the question of conflicts of interest arose. During his tenure with Butler-Hicky, Preston Hicky had participated in at least ten cases involving agricultural chemical claims similar to this case. The files he used in those cases contained confidential information, including insurance policies, coverage questions, and technical

information concerning the various chemicals that might be involved.

After joining Michael Easley, Preston Hicky worked on this case, outlining questions for depositions of witnesses, preparing rough drafts of briefs, and working on exhibits for use at trial. He also testified that, in preparation for trial, he discussed with Michael Easley the various legal and factual issues and assisted in the drafting of jury instructions. Lastly, if the appellee, Billy Morgan, collects a judgment in this case, Preston Hicky admittedly expects to receive his part of the attorney's fee as partner in the firm. Under such circumstances, he would have received a fee from both sides in this case.

For reversal, the appellant asserts six errors, four of which deal with rulings or instructions on damages. The other two points for reversal relate to the conflict-of-interest question. We deem the trial court to be in error on both issues and reverse on the issue of conflict of interest. We also address the damages issue because the same problem may surface on retrial.

Addressing first the conflict-of-interest issue, we note that the Model Rules of Professional Conduct, Rule 1.9, prohibits a lawyer who has formerly represented a client in a matter from representing "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." He is further prohibited from using "information relating to the representation to the disadvantage of the former client."

Rule 1.10(b) expands the prohibition, providing that:

> When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

The "information protected" is any information relating to the representation, not limited to matters communicated in confi-

dence by the client, but also to all information relating to the representation, regardless of its source. *See* Comment to Rule 1.6, Model Rules of Professional Conduct.

In applying these rules of conduct to a particular situation, we must do so with caution when considering disqualification of counsel. Disqualification is an absolutely necessary measure to protect and preserve the integrity of the attorney-client relationship; yet it is a drastic measure to be imposed only where clearly required by the circumstances. We must never forget that a disqualification, though aimed at protecting the soundness of the attorney-client relationship, also interferes with, or perhaps destroys, a voluntary relationship by depriving a litigant of counsel of his own choosing — oftentimes affecting associations of long standing. The role of the court is to balance the current client's right to counsel of choice with the former client's right to protection of confidences transmitted, or likely to have been acquired, during the prior representation.

As was so succinctly stated in *Realco Services* v. *Holt,* 479 F.Supp. 867 (E.D. Pa. 1979):

> It is easier to find a doubt than to resolve difficult questions of law and ethics. The disruption and prejudice that befall a client whose counsel is disqualified are reasons to avoid a hasty conclusion in favor of disqualification, based merely on a doubt about the propriety of the representation.

The appellant contends that where a firm has previously represented a party, gaining in the process confidential information, an irrebuttable presumption arises, which, in effect, charges other members of the firm with knowledge and thus disqualifies all members in subsequent representation in the same or similar matters where such knowledge would compromise the former client's rights. We are not willing to give such a strained application to the rules. Indeed, we believe that Rule 1.10 proscribes such representation only when the attorney involved *actually has knowledge acquired* during the former association. Thus, a rebuttable presumption is created. The entire question of access to confidential information is to be determined by examining the facts of the particular case under consideration.

All inferences, presumptions, and deductions should be

considered in resolving the question of disqualification. When disqualification is sought, the burden of proving not only a lack of knowledge but also a lack of access to information should rest with the challenged attorney alleged to be disqualified.

■ Clearly, under the provisions of Rule 1.10, if it is determined that an individual associated with a law firm is disqualified from participation because of a conflict, then the entire firm must be disqualified.

■ The appellee argues that no *prejudice* resulted from Preston Hicky's participation and therefore no conflict existed. The rules do not require a finding of prejudice in order for a conflict to exist, and we decline to read such a requirement into Rules 1.9 and 1.10.

■ In thus interpreting the Rules, we are not departing from our recent holding in *First American Carriers, Inc.* v. *Kroger Co.,* 302 Ark. 86, 787 S.W.2d 669 (1990). There, two members of the same law firm, unaware of each other's actions, talked with parties with conflicting interests in the same legal matter. We held that the law firm was disqualified from any further representation of either of the parties. In so doing, we relied in part upon an "appearance of impropriety" arising from the dual representation. We recognized that the "appearance of impropriety" prohibition of Canon 9 of the American Bar Association Code of Professional Responsibility was not a part of the Model Rules of Professional Responsibility which we have adopted. Nevertheless, we there recognized and here reassert that the principle is yet alive and, though not controlling, is a rock in the foundation upon which is built the rules guiding lawyers in their moral and ethical conduct. This is a factor that should be considered in *any* instance where a violation of a rule of professional conduct is at issue.

Without restating the testimony produced at the hearing on the appellant's motion for a new trial and set forth earlier in this opinion, there was considerably more than a mere doubt concerning the propriety of the representation. Preston Hicky was so deeply implicated in both sides of this case, as well as his involvement in similar cases in the past while he was associated with Butler-Hicky, that the taint spread, of necessity, to his new partner, Michael Easley. Neither can it be said that Easley is an

altogether innocent victim. He testified at the hearing that prior to filing the complaint, he sought the expertise of Phil Hicky and the Butler-Hicky firm in the nature of an association in this case. The offer was declined. Later, after Preston Hicky joined the new firm, Easley asked Phil Hicky of the Butler-Hicky firm to allow Preston Hicky to participate in the case, and Phil Hicky refused to consent. Easley also testified that he was fully aware of Butler-Hicky's allegation of conflict of interest and the firm's opposition to Preston Hicky's participation during the time Preston Hickey was working on the case in preparation for trial.

The conduct of Preston Hicky clearly constitutes a conflict of interest, and under these circumstances, the firm of Easley & Hicky is disqualified from representing the appellee.

Moving next to the issue of damages, the appellant asserts four points for reversal. He first contends that the trial court should have granted a motion in limine relating to damages and for partial summary judgment as to any such damages.

The appellant next contends that it was error to admit evidence of loss of future production from the young or immature fifty-acre apple orchard.

The third contention relates to the measure of damages instruction given by the court. The fourth point again alleges that the court should have granted the appellant's motions in limine and for partial summary judgment relating to damages beyond the term of the basic lease.

These damage issues were argued and answered together in both briefs, and we agree that all are interdependent, if not repetitious. The court's refusal to grant the motion in limine and partial summary judgment as to damages occurring beyond the basic lease period was incorrect. Further, the court's Instruction No. 14, on the measure of damages, was an inaccurate statement of the applicable law. All other asserted errors relate to specific evidence, and because the evidence will likely be materially different at a retrial, we find it unnecessary to consider those points.

We do not reverse because of the instruction. The record reflects that though appellant made a timely objection to Instruction No. 14, no instruction was offered which correctly

states the applicable law. *See Williams* v. *First Security Bank of Searcy,* 293 Ark. 388, 738 S.W.2d 99 (1987). Because this case is remanded for retrial, we choose to discuss the damages question because it was properly placed in issue by pre-trial motion and by objections during trial but was technically waived by a failure to tender a proper instruction.

The measure of damages instruction given by the court over the objection of the appellant stated:

> If you decide for Billy Morgan on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damage: (AMI 2201)
>
> (a) For 1985 damage to his peach crop and his apple crop in the mature orchard, the difference in the fair market value between the crop that the trees would otherwise have produced and the crop that was actually produced, less the difference between what it would have cost to have harvested and marketed an undamaged crop and what it did cost to harvest and market the actual crop. (AMI 2225)
>
> (b) For loss to the young apple orchard for 1986 and subsequent years, you may consider the loss of productivity to the trees. Lost production of the damaged trees equals the value of the apples that would have been produced had the trees not been damaged, less the value of the apples actually produced and saved harvesting expenses.

Subparagraph (b) of Instruction No. 14 is obviously a statement of law that the appellee and the court thought applicable in this instance, though no such instruction is included in Arkansas Model Jury Instructions.

It will be remembered that the appellee's principal lease expired on December 31, 1986. That lease contained an option to renew, and the court permitted the appellee to prove damages allegedly suffered by the leasehold interest for an option term beyond the expiration of the principal term.

We find no instance where this court has had an opportunity to decide the specific issue here — whether one holding a

leasehold interest in lands is entitled to recover for any damages to the lands occurring beyond the primary lease term. However, in the early case of *Fletcher* v. *Pfeifer,* 103 Ark. 318, 146 S.W. 864 (1912), where the lessee of a building for a fixed term with a privilege of renewal brought an action seeking injunctive relief from interference by the owner of the fee, the Supreme Court held that "a right of action accrues to the tenant on account of the interruption of the enjoyment of his estate and the lessening of the value of the use *for the term* and to the landlord for the permanent injury to the freehold." 103 Ark. at 325, 146 S.W. at 866. (Emphasis added.) Admittedly, the Fletcher case is not binding precedent but is some indication that damages to the leasehold should be limited to the term in existence at the time of the wrongdoing.

There can be little doubt that the damages recoverable by a party holding a leasehold estate are separate and distinct from those damages to which the holder of the fee would be entitled, *St. Louis, I.M. & S. Ry.* v. *Hall,* 71 Ark. 302, 74 S.W. 293 (1903), and both the lessor and the lessee have a duty to mitigate their damages. *Harris Const. Co., Inc.* v. *Powers,* 262 Ark. 96, 554 S.W.2d 332 (1977). Therefore, damages extending beyond the primary term of the leasehold interest should not be damages recoverable by the holder of the lease through the exercise of an option to renew. This is not to imply that the lessee's right of extension through exercise of the option is in any manner impaired. However, with knowledge of the impending damages, he should not be permitted to extend the lease period and recover those damages.

Our interpretation of the measure of damages recoverable by the holder of a lease coincides with the stated law in other jurisdictions considering the question.

The Supreme Court of Idaho, in a case involving damages caused from mistakes made in the application and labeling of herbicide resulting in damage to the lessee's crop, held that the tenant was entitled to recover for the damage to his leasehold *during the pendency of the lease. Wing* v. *Martin,* 688 P.2d 1172 (Idaho 1984).

In the case of *Binder* v. *Perkins,* 516 P.2d 1012 (Kan. 1973), dealing with damage to crops from the effects of spraying on a

neighboring field, the Kansas Supreme Court held that it was error for the trial court to admit evidence of damage beyond the period of the plaintiff's lease in existence at the date of the wrongful act. "It was impossible," the court stated, "for defendant to injure a right of possession that was not in existence at the time of wrongdoing." 516 P.2d at 1017.

█ Upon a retrial, the same proof may not develop; therefore we make no attempt to delineate or restrict any elements of damage which may be properly proved by the lessee, except to say that any damages to the lands and growing crops occurring beyond the term of the lease existing at the time of a wrongful act are not recoverable by the holder of the leasehold estate.

The appellee has filed a motion for assessment of attorney's fees for the failure of the appellant to properly abstract pursuant to Supreme Court Rule 9(d). We find the motion to be without merit and therefore deny it.

Reversed and remanded.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I believe the majority is relying too much on appearance and adopts too strict a standard. Two circuit judges examined the ethics issue in detail and found either no impropriety or no prejudice. The majority opinion asserts that disqualification should occur "only when the attorney involved *actually has knowledge acquired* during the former association." [Emphasis in the original]. I agree, but the majority points to nothing from the proof which meets that test, other than appearances, and I can find nothing on my own review of the record from which to conclude the two trial judges clearly erred.

Appellant's brief does not contend that he and Preston Hickey had other than a general conversation or discussed anything that worked to the advantage of the appellee or to the disadvantage of the appellant. In short, I find no evidence that Preston Hickey's overlapping affiliation with the two firms had any material impact on the case.