SALINE MEMORIAL HOSPITAL and Terry Whittington
as Administrator of Saline Memorial Hospital
*v.* Jackie L. BERRY, as Administrator of the Estate
of Toni Berry, Deceased

95-123                                    906 S.W.2d 297

Supreme Court of Arkansas
Opinion delivered September 25, 1995

*Friday, Eldredge & Clark*, by: *Diane S. Mackey* and *Gregory D. Taylor*, for appellants.

*Patton Law Offices*, by: *Nicholas H. Patton*, for appellee.

DAVID NEWBERN, Justice. The issue in this appeal is whether the Trial Court erred by disqualifying the law firm Friday, Eldridge, and Clark (Friday firm) from representing Saline Memorial Hospital in an action brought pursuant to the Freedom of Information Act (FOIA). Ark. Code Ann. §§ 25-19-101 through 25-19-107 (1992 Repl. and Supp. 1995). The Trial Court held that the Friday firm had a conflict between its interest in representing the hospital in the FOIA litigation and its interest in representing St. Paul Fire and Marine Insurance Company (St. Paul) in other litigation. We hold that, to the extent there was a conflict, it was not of such a nature as to require disqualification in the circumstances presented. We reverse and remand the case to the Trial Court for further proceedings.

Appellee Jackie Berry alleged that the hospital and certain of its employees committed medical malpractice. Pursuant to the law which permits an action to be brought directly against the insurer of a publicly owned hospital, Ark. Code Ann. § 23-79-210 (Repl. 1992), she sued St. Paul. Ms. Berry brought an FOIA action against the hospital and its administrator, Terry Whittington, for the release of certain documents and records. The Friday firm represents St. Paul in defense of Ms. Berry's mal-

practice claim and the hospital in defense of Ms. Berry's FOIA claim.

In her motion to disqualify the Friday firm in the FOIA case, Ms. Berry argued that the hospital and St. Paul had adverse interests. Her contention was that the hospital, as a public institution, had an interest in divulging as much information as possible, but that St. Paul's concern was directly opposite in that it wished to conceal as much information as possible about hospital procedures and records in its defense of the malpractice claim. During oral argument of this case before us, counsel for Ms. Berry agreed that the real interest contended to be adverse to that of St. Paul was not so much that of the hospital but that of the public.

Ms. Berry's FOIA request to the hospital was extensive. She listed 20 categories of information, including such items as all records of insurance coverage and claims correspondence, memoranda, investigations, etc., over a three-year period, records of witness statements in the malpractice suit, all records with respect to other lawsuits against the hospital from 1985 onward, records of any meetings concerning the incidents subject to Ms. Berry's malpractice claim, and records of medical staff meetings over a four-year period.

The hospital's board of directors held a meeting to discuss and respond to the FOIA request. The directors were advised of a letter from the local prosecutor, apparently acting as attorney for Saline County, the hospital's parent political entity, to turn over every document requested. The prosecutor informed the directors that failure to do so could result in criminal liability of the directors under the FOIA but that so long as the matter was being litigated they would not be prosecuted.

Also present at the directors' meeting were representatives of the Friday firm who advised the directors of the importance of confidentiality of patient records. They also pointed out that giving up all the records requested without having the matters determined by a court could threaten the hospital's accreditation with medical organizations and would cause a risk of increased insurance premiums if not indeed the hospital's very insurability against malpractice claims. The lawyers discussed with the directors the difference between information subject to discovery under the Arkansas Rules of Civil Procedure and the broader

requirements of the FOIA. They said the hospital should turn over anything required by the FOIA but not materials exempted from its coverage. They acknowledged the risks involved in withholding some of the items requested by Ms. Berry. Their recommendation was to seek a protective order from a court with respect to the items considered privileged.

Various directors, including physician members of the board, spoke to the need for confidentiality, especially with respect to hospital peer review programs in which absolute candor in closed discussions was required in an effort to improve the hospital's performance. One physician said he would refuse to participate in any such program unless it were to remain confidential.

A motion was made "to take the necessary steps to protect those records and documents from disclosure to the extent they are protected by Arkansas law." The motion passed unanimously.

In its response to the FOIA request, the hospital agreed to release some of the information requested but asserted specific statutory exemptions with respect to some requests, *see* Ark. Code Ann. §§ 16-46-105(a) (Repl. 1994) and 20-9-503 (Repl. 1991), and the attorney-client and attorney work product privilege as to others. It refused to release medical staff meeting minutes, asserting a specific statutory privilege. As to some items, the hospital refused the requests on the ground that the items were not in its possession but were in the possession of St. Paul or its attorneys.

In response to Ms. Berry's motion to disqualify the Friday firm, Mr. Whittington submitted an affidavit in which he stated that the hospital's interest was to protect its quality assurance and peer review programs and that those programs would fail if records were subject to public scrutiny. Upon failure of such programs, he said, the hospital would lose its accreditation, licensure, medicare reimbursement and, likely, its insurability. He stated his interest and that of the hospital to be to keep those events from occurring. He stated further that the interests of the hospital and those of St. Paul were not adverse, but, "If the interests are deemed to be adverse, the hospital and I consent to the representation by the Friday Firm in this matter."

The primary reference in any modern day disqualification

case is to Rule 1.7 of the Model Rules of Professional Conduct which provides:

> (a)   A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> (1)   the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
>
> (2)   each client consents after consultation.
>
> (b)   A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1)   the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2)   the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

### 1. Adverse interests

One client's interest is "directly adverse" to that of another client when, according to the comment to Rule 1.7, a lawyer acts as an advocate against a client whom he represents in another matter. That is not the situation in this case. The comment states, "Paragraph (a) prohibits representation of opposing parties in litigation." Were it not for the hospital's immunity and our direct-action statute, cited above, the hospital would be the defendant in Ms. Berry's malpractice claim and presumably St. Paul would be providing its defense. They would have an identity of interests in defending against the claim.

The question thus becomes whether the Friday firm's representation of the hospital may be "materially limited," in the words of subsection (b) of the rule, by its representation of St. Paul in Ms. Berry's malpractice claim. If that is the case, then what of Mr. Whittington's consent, on behalf of himself and the

hospital, and the expression in his affidavit of his desire for such representation?

## 2. Material limitation

Consent becomes important if we determine there is the sort of material limitation of the Friday firm's representation of the hospital to which Rule 1.7(b) refers. To determine the extent, if any, of a limitation on the Friday firm's representation of the hospital's interest in the FOIA case by virtue of its representation of St. Paul, we must assess and define the hospital's interest.

■ The criminal liability which can be incurred by negligently refusing to honor an FOIA request is a misdemeanor fine of "not more than two hundred dollars ($200) or thirty (30) days in jail or both or a sentence of appropriate public service, or both." § 25-19-104. Costs and other litigation expenses might be assessed against the hospital "unless the court finds that the position of the defendant was substantially justified." § 25-19-107(d).

No doubt the hospital and its personnel have an interest in not being found guilty of a misdemeanor or assessed costs. The broader, long-range interests of the hospital, however, as expressed by the directors in their vote on the issue and by Mr. Whittington's affidavit, obviously supersede, in the collective mind of the directors and their administrator, the fear of prosecution and the costs. According to them, the interest of the hospital is in protecting itself by declining to release some of the items requested.

■■ We cannot say that the Friday firm will be "materially limited" in its representation of the hospital's interest as it is so much the same as that of St. Paul. Obviously, there may be conflicting public interests at stake. The policy of the FOIA in making available to the public information about a publicly owned institution may conflict with the public interest in having a hospital capable of conducting quality assurance and peer review programs in confidence to assure good and improving performance. To the extent the dispute over release of the requested items involves matters not protected by statute or other privilege from disclosure, or in which the hospital may have no legitimate confidentiality interest, the interest to be protected is, again, that of the public in freedom of information. While the hospital and its personnel have, as does any citizen, a duty to fol-

low the FOIA, there is nothing to prevent its following the advice of counsel in weighing that duty against other legal duties it may have. The arbiter who will protect the public's interest with respect to information as to which there is a dispute is the Trial Court, and the issues are the same as are found in any garden-variety FOIA dispute.

■ Even if we were to say the Friday firm's representation of the hospital might be "materially limited" by its relationship with St. Paul, we could not justify the disqualification on that basis because the hospital has given its consent to the Friday firm's representation of it after consultation as provided in Rule 1.7(b)(2). That does not end the matter, however, as Ms. Berry contends, and the Trial Court apparently agreed, that the conflict in this case presents such an appearance of impropriety that it cannot be consented to.

### 3. Appearance of impropriety

The Trial Court articulated his reason for holding in favor of disqualification as follows:

> There could be a very clear conflict there if there were records which under the [FOIA] should be released which could be damaging to [St. Paul] in the [malpractice] case. Then there's the appearance that the Friday Firm might say, "Wait a minute. We'll hold these back." And just that appearance, I think, is enough to disqualify the Friday Firm.

■ The hospital points out that the concept of appearance of impropriety is not discussed in the Model Rules of Professional Conduct as it was in the predecessor Code of Professional Responsibility. We first recognized that fact in *First Am. Carriers, Inc.* v. *The Kroger Co.*, 302 Ark. 86, 787 S.W.2d 669 (1990). While the Model Rules, as stated above, furnish guidance in disqualification matters, not all the law of disqualification is found there.

In the *First Am. Carriers, Inc.*, case we based our affirmance of a disqualification holding, in part at least, on the appearance of impropriety arising from a law firm representing a client against a party which had been, although only fleetingly, its client in the same litigation. One lawyer in the firm did not know that another

had consulted in a very minimal way with the party which became the firm's client's adversary.

We reasserted the appearance-of-impropriety standard forcefully in *Burnette* v. *Morgan*, 303 Ark. 150, 794 S.W.2d 145 (1990). There we held an appearance of impropriety was presented when a lawyer switched firms and participated in litigation on behalf of a client against a client for whom he had worked in his former firm on the very case at issue.

■   In *Heathcoat* v. *Santa Fe Intern. Corp.*, 532 F.Supp. 961 (E.D. Ark. 1982), a question of disqualification arose with respect to a law firm which represented a client against a woman for whom it had, some 16 years earlier, prepared a will and to whom it had sent a letter more recently advising that the will might be outdated due to tax law changes. The Court found no substantial relationship between the firm's work with respect to the will and the litigation at hand which had to do with fraud in a sale of stock but then discussed the appearance of impropriety as follows:

> The discussion set forth above of Canons 4 and 5 [of the Code of Professional Conduct] clearly illustrate that a "reasonable possibility" of the public's perceiving some impropriety in the instant situation simply does not exist. When evaluating the public's view, "we must be careful not to accept the view of the most cynical as the true voice of the public." . . . Rather, "the Court must consider what it believes would be the view of the average layman." . . . Considering the average layman's perception of this case, the Court believes "that such an individual would not be troubled by the current posture of the parties and counsel in this suit." . . . .
>
> Further, due consideration must also be given to a client's interest in retaining the counsel of his choice, an interest which the courts have not regarded as insignificant. . . . In the present case, since the defendants have expressed great interest in retaining the services of their challenged counsel, and since the alleged conflicts of interest are more technical than real, the Court concludes Canon 9 does not mandate the disqualification of any of the attorneys for the defendants. [Citations omitted.]

■ We too have alluded to the importance of the right of the client to choose counsel and to the balancing which must be done between that right and protection against conflicts of interest. For example, in the *Burnette* case we said:

> In applying these rules of conduct to a particular situation, we must do so with caution when considering disqualification of counsel. Disqualification is an absolutely necessary measure to protect and preserve the integrity of the attorney-client relationship; yet it is a drastic measure to be imposed only where clearly required by the circumstances. We must never forget that a disqualification, though aimed at protecting the soundness of the attorney-client relationship, also interferes with, or perhaps destroys, a voluntary relationship by depriving a litigant of counsel of his own choosing — oftentimes affecting associations of long standing. The role of the court is to balance the current client's right to counsel of choice with the former client's right to protection of confidences transmitted, or likely to have been acquired, during the prior representation.

■ All of these cases involve instances of representation of a client against a former client. The matter now before us is different. Ms. Berry has had no association with the Friday firm. She is not asserting any interest she may have as a litigant about confidences she may have bestowed upon the attorney of her adversary in this FOIA litigation. To the extent she has standing to complain about the Friday firm's representation of the hospital, it must be as a member of the public. We have not decided a case directly on point. In our unsuccessful search of the law of other jurisdictions for a case such as this one, we found language such as the following from *BML Group, Inc. v. U.S. Pizza, Inc.*, 1992 WL 114958 (E.D. Pa.), which seems applicable here:

> As Judge Ditter held in *Hamilton v. Merrill Lynch*, 645 F. Supp. 60, 61 (E.D. Pa. 1986): "Plaintiffs' choice of counsel is entitled to substantial deference. The court should not quickly deprive plaintiffs of their freedom to choose the advocate who will represent their claims, nor lightly dismiss the trust and confidence plaintiffs have placed in their chosen counsel. Additionally, the court must prevent liti-

gants from using motions to disqualify opposing counsel for tactical purposes. For these reasons, motions to disqualify counsel generally are not favored."

The lay person, of whom the opinion in the *Heathcoat* case speaks, who understands (1) the fact that there are divergent public policies to be served in making the FOIA decisions the Trial Court must make in this case; (2) the consent and desire of the hospital to be represented by the Friday firm, and (3) the fact that, but for our direct-action statute, there would be no issue whatever, will very likely conclude that no impropriety exists in the Friday firm's representation of Saline Memorial Hospital.

■ Even if there were an appearance of that which a lay person might consider somewhat improper, when we balance the right of a party to choose counsel against our duty to protect the administration of justice from such an alleged appearance of impropriety, we must conclude that disqualification of the Friday firm in this litigation is not warranted.

Reversed and remanded.