DENNIS W. HARKER AND MARY HARKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harker v. Commissioner
Docket No. 15092-92
United States Tax Court
T.C. Memo 1994-583; 1994 Tax Ct. Memo LEXIS 598; 68 T.C.M. (CCH) 1272; December 1, 1994, Filed *598 An appropriate order will be issued and decision will be entered under Rule 155. For petitioners: Larry E. McKibben and Michael R. Horn. For respondent: Mary Ann Waters and Jeffrey A. Schlei. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies and additions to tax for petitioners as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661 1985
$  12,947.92
$   7,968.96
[1]
$  3,984.00
Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)(A)
Sec. 6653(b)(1)(B)
Sec. 6661 1986
134,334.53
126,743.65
[2]
42,248.00
1987
--  184,392.34
[3]
61,464.00
In the amended answer, respondent asserted the following deficiencies and additions to tax: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661 1985 $  17,080 $   10,035
[1] $  5,018
Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)(A)
Sec. 6653(b)(1)(B)
Sec. 6661 1986
159,214
145,403.65
[2]
48,468
1987
--  199,257.00
[3]
66,419
*599 After concessions, the following issues remain to be decided: 1. Whether Jeffrey Schlei and the attorneys in the office of the Des Moines, Iowa, District Counsel should be disqualified because of a conflict of interest. We hold that they should not. 2. Issues relating to respondent's use of a net worth analysis to calculate petitioners' income: (a) Whether respondent properly calculated the value of petitioners' (i) guns, (ii) coins, and (iii) net deferred gain on real estate contracts. We hold that respondent did. (b) Whether respondent established a likely source of income and sufficiently investigated and negated leads. We hold that respondent did. 3. Whether petitioners are liable for additions to tax for fraud for tax year 1985 under section 6653(b)(1) and (2), and for tax years 1986 and 1987 under section 6653(b)(1)(A) and (B). We hold that they are. 4. Whether petitioners are liable for additions to tax for substantial understatement of tax for the years 1985, 1986, and 1987 under section 6661. We hold that they are. References to petitioner in the singular are to Dennis Harker. Section references are to the Internal Revenue Code in effect for the years in *600 issue. Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners lived in Des Moines, Iowa, when the petition was filed. Petitioners lived in Laredo, Texas, when they filed their 1985 and 1986 joint Federal income tax returns. Petitioners lived in Coral Gables, Florida, when they filed their 1987 joint Federal income tax return. Petitioners' standard of living was modest. Petitioner was employed as a special agent of the Drug Enforcement Administration (DEA) during each of the years in issue. Petitioner received instruction in net worth analysis in 1982 as part of his DEA training. Mary Harker was not employed from 1985 to 1987. She attended the Laredo Junior College Nursing School in 1986 and 1987. She worked at a Laredo hospital as part of her training. Mary Harker sometimes used her maiden name, Mary Tyler or Mary Ann Tyler, during the years in issue. She used her maiden name when she worked at the hospital because she feared for her safety due to petitioner's drug law enforcement activities. She had a checking account *601 in the name of Mary Ann Tyler at the First National Bank of West Des Moines in 1986. She used her Social Security number to open this account. Mary Harker held some partnership interests and bank accounts in her married name. Before moving to Laredo, petitioner worked for the DEA in St. Louis, Missouri. In 1973, while petitioners were living in St. Louis, petitioner was sued in civil court for actions he and some of his coworkers allegedly took during a drug raid. Petitioner was suspended without pay. He was later reinstated and received backpay for the time he was suspended. Petitioners bought their home in Laredo for $ 58,783.55 in 1979. In 1987 petitioners sold their Laredo home for $ 85,000 and bought a home in Coral Gables, Florida, for $ 166,000. The houses in Laredo and Coral Gables were recorded in the names of Dennis and Mary Harker. In January 1987, petitioners bought a farm in Boone, Iowa, for $ 155,000 (Boone farm). The Boone farm was recorded in the name of Mary Tyler. The mortgage on the Boone farm was in the name of Dennis Harker and Mary Ann Tyler (a.k.a. Mary Harker). Petitioners paid for the farm in full by the end of 1987. In April 1987, petitioners *602 bought a farm near Fort Madison, Iowa (Fort Madison farm), for $ 49,440. The Fort Madison farm was recorded in petitioner's name. Petitioners paid for the Fort Madison farm in full by the end of 1987. 2. Petitioners' Income
Petitioner's salary from the DEA was $ 50,225 for 1985, $ 48,909 for 1986, and $ 66,133 for 1987. Petitioners also had income from the sources discussed below in those years. a. Merchandise
Petitioner bought and sold guns, coins, and electronic equipment. Petitioners had so many electronic products in their family room that it frequently was uninhabitable. Petitioner usually conducted the merchandise sales. Mary Harker knew that petitioner had income from the sale of guns, coins, and electronic products, and she was often home when petitioner made sales. She sometimes sold guns for petitioner when he was not home. Petitioners did business with both Mexican and United States citizens. i. Guns
Petitioners were licensed by the Bureau of Alcohol, Tobacco and Firearms (ATF) as firearms dealers. Licensed dealers must fill out an ATF Form 4473 for each firearm sale. Petitioners called their gun selling activity "D & M Police Supplies". *603 D & M stood for Dennis and Mary. Mary Harker conducted some sales, but she did not buy guns or record any of the sales she made. ii. Coins
Petitioner bought and sold coins. He began collecting coins when he was a teenager. Petitioner collected coins such as old nickels and dimes, silver dollars, and gold coins. Petitioner bought silver dollars from a coworker in 1985 and resold them in the same year. Petitioner sold all of his nickels and dimes in 1987 for $ 500. In a book in which petitioner put information his family would need if something happened to him, petitioner wrote "Profit from gold coins does not have to be reported because there are no records." iii. Electronic Equipment
Petitioner periodically sold electronic products such as computers. He began selling electronic products in 1983 when he bought the inventory of a store that was going out of business. b. Real Estate
Petitioners built and sold seven houses in Laredo in 1986 and 1987. They hired Juan Gomez (Gomez) to build the houses and paid him commissions for helping them sell the houses. The houses were recorded in the name of Mary Tyler/Mary Ann Tyler. Mary Harker used cash and bought *604 money orders to pay for the lots and signed her name to the financing documents they sent to buyers. She was listed as the seller of all of the houses. Her name was on most of the receipts from Gomez. Petitioner went to the construction sites and his name was on one receipt from Gomez. On August 1, 1987, petitioners sold the house they built at 104 Fairway Lane to Eligio and Betzabe Gonzales for $ 77,000. Petitioners financed some of the house sales. On some of the house sales they financed, petitioners gave the buyers loan payment books with preaddressed envelopes and sent the buyers yearly statements which showed interest and principal paid, outstanding mortgage balances, and real estate taxes. Petitioners sent notices to the buyers if their payments were late. Mary Tyler was the only seller listed on the sales contracts and financing documents. Mary Tyler often deposited payments she received on the sale of the houses in bank accounts in Texas and Florida, both of which were in the name of Dennis Harker and Mary Tyler. c. Partnerships
Petitioner was a partner in several partnerships during the years in issue, including the Harker-Terry Properties partnership. Susan *605 Terry (Terry), petitioner's partner, deposited $ 75,000 in the partnership in April 1986. In September and October 1986, petitioners lent Terry a total of $ 75,000, mainly in the form of money orders. Terry used this money to buy real estate for Harker-Terry Properties. In September and October 1986, petitioner sent two notes to Terry stating that he would send her money as soon as he got it from his "loan man". 3. Cash Transactions
Petitioners engaged in many large cash transactions during the years in issue. During the years in issue, petitioners had cash transactions, wrote checks, and used cash to purchase money orders and cashier's checks in the following amounts: Cashier's Checks
and Money Orders
Year
Cash
Purchased Checks
1985
-0-   $  10,170.00 $  44,234.51
1986
241,175.80
146,292.25
106,065.03
1987
589,291.81
17,000.00
242,341.26
Petitioners bought and sold most of the guns for cash. Petitioner bought and sold most of the coins and electronic equipment for cash. Petitioners used cash to buy the lots for building houses. Mary Harker often delivered the payment to the owners of the lots. Petitioners paid Gomez, who petitioners *606 hired to help them build and sell houses, more than $ 300,000 in cash for construction costs and commissions. Gomez signed receipts for the money that petitioners paid him. Mary Tyler was often the payor. Gomez was audited by the Internal Revenue Service (IRS). At the time of trial he owed taxes as a result of the audit. Mary Harker paid $ 74,915 in cash as a downpayment on the Boone farm. She made the payment to the Federal Land Bank Association which filed a Report of Cash Payments Over $ 10,000 in a Trade or Business on the transaction. She flew to Iowa with the cash in her skirt pocket. Petitioner mailed $ 7,450 and $ 8,500 in cash to Walter and Betty Smalley, petitioner's mother and stepfather, to make payments on the Boone farm for petitioners. Petitioner sent $ 15,000 and $ 45,000 in cash by registered mail to Dan and Lori Miller, Mary Harker's sister and brother-in-law, to make payments on the Fort Madison farm for petitioners. Petitioner valued the packages at zero on the registered mail receipts. The Millers opened a bank account in Iowa titled "Harker account c/o Daniel or Lori Miller" under Dan Miller's Social Security number. Dan Miller deposited the $ 15,000 *607 and $ 45,000 that petitioner mailed into this account. The bank filed a Currency Transaction Report (CTR) for Dan Miller. Petitioners paid $ 70,043.29 in cash as a downpayment for their house in Coral Gables. The bank where petitioners' attorney deposited the downpayment filed a CTR on this transaction. Petitioners lent money to friends and family members. On December 31, 1987, petitioners had accounts receivable of $ 304,674.98. Petitioners charged interest on the loans and sometimes gave loan payment books to their borrowers. Petitioners lent Gomez $ 20,000 in March 1987. Petitioner acknowledged receipt of $ 5,000 from Gomez on August 14, 1987, in writing. Petitioner wrote on the receipt "Funds from fee ref. Gonzales house." Gomez repaid the entire loan from petitioners in 1987. 4. Petitioners' Financial Statements
Petitioners prepared several financial statements during the years in issue, some of which were to obtain loans. On these statements petitioner listed investments such as stocks and bonds and personal property such as furniture as assets, but he did not list all of his assets and liabilities on some of the statements because he only provided enough *608 information to qualify for the loans. Some of his statements listed assets that were in Mary Harker's name, such as automobiles. On his financial statements, petitioner valued his gun inventory at $ 25,000 on August 22, 1984, $ 32,000 on January 1, 1986, and $ 30,000 on February 23, 1987, and January 10, 1988. On his financial statement he prepared on August 22, 1984, to obtain financing for his partnership with Terry, petitioner did not list coins as an asset. On petitioner's later financial statements, he reported coin and bullion inventory of $ 20,000 on January 1, 1986, and $ 30,000 on February 23, 1987, and January 10, 1988. On the financial statement petitioner prepared on August 22, 1984, the largest two assets petitioner listed were real estate that he valued at $ 206,666 and his stock portfolio that he valued at $ 31,000. Petitioner prepared a statement titled "General Summary of Assets as of 1980" (1980 Summary). On it petitioner listed the following assets: new gun investments/original new guns, $ 25,000; 200 personal and used guns, $ 70,000; miscellaneous ammunition, leather, tools, etc., $ 15,000; silver dollars, $ 8,250; regular coins, $ 10,000; and gold coins, *609 $ 20,000. Petitioner did not provide any detail to support his valuations. Petitioner did not sign or date this statement. Mary Harker did not list guns or coins as an asset on a financial statement she signed on January 30, 1987. Mary Harker did not list any liabilities from loans from individuals. Petitioner told Mary Harker what information to list on this financial statement. Petitioner prepared a financial statement in Mary Harker's name in December 1987 titled "Personal Financial Statement". Petitioner listed two asset groups: "Six houses Laredo, Tx", which he valued at $ 349,750, and Boone Farm, which he valued at $ 155,000. Petitioner listed two liabilities: $ 230,000 which petitioners owed for the houses they built in Laredo and $ 41,000 which they owed for the Boone Farm. Petitioner typed this financial statement on the back of a map. Neither petitioner nor Mary Harker signed this financial statement. 5. Petitioners' Tax Returns
An accountant named Ray Berend (Berend) prepared petitioners' tax returns for the years in issue. Berend began preparing petitioners' returns in 1983. Before 1983, petitioner or H & R Block prepared petitioners' returns. Petitioners *610 rolled over the gain on the sale of their home in 1974 and began investing in IRA's in 1982 or 1983. Every year Berend sent petitioners a booklet in which they were to list their tax information. Berend used the booklets to prepare petitioners' tax returns. The information sought in the booklets included wages, interest, and other miscellaneous income. The booklet also asked taxpayers to list their tax exempt income and any other income that they did not list elsewhere in the booklet. Petitioner completed the booklets and communicated with Berend. Mary Harker was not involved in preparing petitioners' tax return and did not communicate with Berend. Petitioners had taxable income from the sale of guns, coins, and electronics in 1985, 1986, and 1987. Petitioner did not tell Berend about or report on their tax returns any income from the sale of guns or coins in 1985, 1986, or 1987. Petitioner told Berend about and reported on their tax return $ 30,000 of income from electronics sales for 1986. Petitioners reported taxable income as follows on their tax returns as originally filed for the years in issue: Year
Taxable Income
1985 $ 22,176
1986
38,999
1987
34,274
*611 Petitioners did not deduct interest payments to any individuals on their returns for the years in issue. In 1983 and 1986, Berend classified income from the sale of electronics as income from a trade or business. Petitioner told Berend that he was not an electronics dealer and asked Berend to reclassify the income as capital gain. 6. Petitioners' Net Worth
Petitioners owned the following assets in the years 1984 to 1987: Assets
12/31/84
12/31/85
12/31/86
12/31/87
Cash on hand $  35,793.00 $  51,509.00 $  22,764.00 $  16,798.00
Cash in banks
4,440.93
10,861.58
44,077.46
56,192.54
Real estate
82,643.74
84,906.50
243,257.38
668,899.98
Partnerships
27,629.00
36,022.00
102,708.00
70,934.00
Accounts
receivable
12,620.00
12,660.00
92,910.00
314,674.98
Vehicles
5,000.00
5,000.00
30,162.60
30,162.60
Computer
-0-  -0-  -0-  1,700.00
Investments
53,443.11
84,553.96
164,689.74
321,140.00
Guns
19,344.85
25,714.89
28,100.46
23,316.84
Total
240,914.63
311,227.93
728,669.64
1,503,818.94
7. Petitioners' Criminal Convictions
In November 1986, petitioner's supervisor questioned him about some of petitioner's large cash *612 transactions, particularly the money orders that petitioner bought to give to Terry in September and October 1986. In memos to one of his supervisors, Special Agent Marion Hambrick (Hambrick), petitioner said that he had large amounts of cash because he was selling his gun inventory, coins, and electronics. Petitioner told another one of his supervisors, Kenneth Miley, that he had obtained large amounts of cash by investing in real estate that was held in his wife's name. Petitioner did not say that he had received any loans from individuals in these conversations or memos. In March 1988, Special Agent James Donlan (Donlan) of the Federal Bureau of Investigation (FBI) initiated a criminal investigation of petitioners. Donlan and IRS and DEA agents searched petitioners' Florida home in November 1988. During the search, the agents seized 22 rolls of coins. They also seized three notes dated April, March, and September 1986 which stated that Juan Martinez (Martinez) had lent $ 75,000, $ 80,000, and $ 75,000, all at an interest rate of 7 percent, to Mary Tyler. There is no evidence that these loans were ever deposited into or repaid from petitioners' bank accounts. None of petitioners' *613 financial statements list a liability to Martinez. The agents did not inventory guns when petitioners' house was searched. In 1989, criminal charges were filed against petitioners for tax evasion. Petitioner pleaded guilty to tax evasion for 1987, and Mary Harker pleaded guilty to tax evasion for 1985. After they pleaded guilty to tax evasion, petitioners filed amended returns for 1985, 1986, and 1987 on which they reported taxable income as follows: Year
Taxable Income
1985 $  32,466
1986 $ 127,999
1987 $ 597,029
On their 1985, 1986, and 1987 amended returns, petitioners reported net profits from computer sales of $ 78,000 in 1986 and $ 530,800 in 1987. Petitioners reported income from coin sales on their 1985 and 1986 amended returns but not on their 1987 return. [1] Petitioners did not report income from gun sales on their amended returns. In 1990, petitioner was charged with failing *614 from January 1982, until at least December 1986, to give the Treasury of the United States money that he obtained as part of his DEA law enforcement operations. Petitioner pleaded guilty to this charge. 8. Respondent's Counsel's Prior Employment in Private Practice[2]
From 1987 to 1991, respondent's counsel, Jeffrey Schlei (Schlei), was an associate of Isaacson & Clarke, P.C. (Isaacson & Clarke), a law firm with four attorneys that represented petitioners in the criminal tax evasion proceedings from September 1989 to January 1991. The Isaacson & Clarke attorney who represented petitioners was Mark Godwin. While he was employed by Isaacson & Clarke, Schlei was not involved in any legal matters involving Dennis or Mary Harker. Schlei was not privy to oral or written confidential communications of Dennis or Mary Harker, and was not privy to any of Dennis or Mary Harker's files. Schlei began *615 working on this case on August 3, 1993. OPINION 1. Petitioners' Motion to Dismiss
Petitioners contend that Schlei has a conflict of interest under Rule 1.9(b) of the Model Rules of Professional Conduct of the American Bar Association (Model Rules) because of his association with Isaacson & Clarke, and that under Model Rule 1.10(b), Schlei and all other attorneys in the office of the Des Moines, Iowa, District Counsel should be disqualified from participating in this case. We denied petitioners' motion before trial and reaffirm that ruling here. a. Relationship Between Model Code of Professional Responsibility and Model Rules of Professional Conduct
Petitioners contend that the following cases support their position: State of Arkansas v. Dean Foods Prods. Co., 605 F.2d 380 (8th Cir. 1979) and Fred Weber, Inc. v. Shell Oil Co., 566 F.2d 602 (8th Cir. 1977). [3] Those cases were decided under Canons 4 and 9 of the Model Code of Professional Responsibility (Model Code). Canon 4 provides that lawyers should preserve the confidences and secrets of clients. Canon 9 of the Model Code provides that lawyers should *616 avoid the appearance of professional impropriety.
In these cases, the U.S. Court of Appeals for the Eighth Circuit stated that, to prevent the "appearance of impropriety", a lawyer is presumed to have knowledge of all confidential information relating to clients of the lawyer's firm and thus is disqualified from taking a position adverse to a former *617 client in a substantially related matter. State of Arkansas v. Dean Foods Prods. Co., supra at 385-386; Fred Weber, Inc. v. Shell Oil Co., supra at 608-609. In Dean Foods Prods. Co., the Eighth Circuit held that a lawyer who transferred from a law firm to Government practice was disqualified from representing the Government against a client of his former firm and that his Government coworkers were also disqualified. Practitioners before this Court must conduct their practice according to the Model Rules. Rule 201(a). The cases cited by petitioners are not controlling here because they were decided under the Model Code, which preceded the Model Rules. See Lawline v. American Bar Association, 956 F.2d 1378, 1381 n.1 (7th Cir. 1992) (the Model Rules supersede the Model Code); Bieter Co. v. Blomquist, 132 F.R.D. 220, 225 n.8 (D. Minn. 1990). The Model Rules do not include the "appearance of impropriety" language that was in Canon 9 of the Model Code. Many courts found the "appearance of impropriety" test to be excessively vague and harsh. Waters v. Kemp, 845 F.2d 260, 265 n.12 (11th Cir. 1988) *618 (quoting Board of Educ. v. Nyquist, 590 F.2d 1241, 1247 (2d Cir. 1979); Model Rule 1.9 cmt. (1992). Even before the Model Rules were promulgated, courts warned against using the appearance of impropriety test excessively and suggested that its use be reserved to those situations where the facts so warranted. International Elecs. Corp. v. Flanzer, 527 F.2d 1288, 1295 (2d Cir., 1975). The Model Rules were intended to better define a standard which would give clients confidence in the loyalty of their lawyers, but would permit lawyers to move freely from one practice to another. Model Rule 1.9 cmt. (1992); Waters v. Kemp, supra at 265 (the mere appearance of impropriety is not grounds for disqualifying a lawyer under the Model Rules). We note that in First Am. Carriers, Inc. v. Kroger Co., 787 S.W.2d 669 (Ark. 1990), the court considered the appearance of impropriety in applying the Model Rules. In First Am. Carriers, Inc., an attorney in a law firm agreed to represent the insured of an insurance company without knowing that another attorney in that firm *619 represented an adverse party. That attorney voluntarily withdrew upon learning of the conflicting representation. The court held that the attorney's representation of the insured was a conflict of interest and that the attorney who represented the adverse party should also be disqualified under Model Rules 1.9 and 1.10. The facts in this case are distinguishable from the facts in First Am. Carriers, Inc. First, there was an actual conflict under Model Rule 1.9(a) in First Am. Carriers, Inc., because the attorneys in the law firm represented opposing interests in the same matter at the same time, albeit unknowingly. Second, the attorney who represented the insured in First Am. Carriers, Inc., obtained information that could have been used against the insured. Id. at 671-672. For example, the attorney advised the insured about whether it would be prejudicial in a later trial if the insured paid funeral expenses for the opposing party. Id. at 670. In contrast, Schlei did not represent petitioners or anyone adverse to them while he was an associate with Isaacson & Clarke, he did not represent an interest *620 adverse to petitioners until after he left Isaacson & Clarke, and he was not privy to any information about petitioners that could be used to their detriment. In deciding that the attorney should be disqualified, the court in First Am. Carriers, Inc., stated that the concept of appearance of impropriety "pervades the Rules and embodies their spirit. It is included in what the preamble to the Rules refers to as 'moral and ethical considerations'". Id. at 672. The court did not provide a quote or citation to support its suggestion that the appearance of impropriety standard appears in the preamble to the Model Rules, and we are unable to find it in the preamble. In accord, Waters v. Kemp, supra at 265 n.12 (appearance of impropriety standard does not apply under the Model Rules); Model Rule 1.9 cmt. (1992) (Model Rules were intended to remedy the vagueness of the appearance of impropriety test by providing a clearer definition of what constitutes a conflict of interest). Another case involving facts similar to First Am. Carriers, Inc., was National Texture Corp. v. Hymes, 282 N.W.2d 890 (Minn. 1979). *621 However, National Texture was decided under the Model Code, not the Model Rules, and thus is not controlling authority here. b. Model Rule 1.9
Petitioners contend that Model Rule 1.9 bars Schlei from representing respondent in this case. Model Rule 1.9 provides: (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client (1) whose interests are materially adverse to that person, and (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter, [4] unless the former client consents after consultation. *622 (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or (2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.
Rule 1.9(a) does not apply to Schlei because he did not represent petitioners in their criminal case. Rule 1.9(b) does not apply to Schlei because Schlei did not acquire confidential information (as defined in Model Rules 1.6 and 1.9(c)) about petitioners while he worked at Isaacson & Clarke. Model Rule 1.9(b) applies only if the lawyer had actual knowledge of confidential information. Model Rule 1.9(b) comment (1992). The lawyer whose disqualification is sought bears the burden of proving that he did not have knowledge of confidential information. See Huntington v. Great Western Resources, Inc., 655 F. Supp. 565 (S.D.N.Y. 1986). *623 We have found that Schlei did not have access to or acquire any knowledge of confidential information about petitioners while he was associated with Isaacson & Clarke. Thus, we hold that Schlei does not have a conflict of interest under Model Rule 1.9(b). c. Model Rules 1.10 and 1.11
Petitioners contend that Model Rule 1.10 bars all of the attorneys in the office of the Des Moines, Iowa, District Counsel from representing respondent in this case. Model Rule 1.10 provides: (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2. (b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless: (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material *624 to the matter.
(c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.
Petitioners' reliance on Model Rule 1.10(b) is misplaced. Model Rule 1.11(c)(1) applies in lieu of Model Rule 1.10 where a lawyer leaves private practice to represent the Government. Model Rule 1.10 cmt. (1992). Model Rule 1.11(c)(1) (1992) provides: (c) Except as law may otherwise expressly permit, a lawyer serving as a public officer or employee shall not: (1) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment unless under applicable law no one is, or by lawful delegation may be, authorized to act in the lawyer's stead in the matter. [5]
Disqualification is not imputed to other Government lawyers under Model Rule 1.11(c)(1). Model Rule 1.11 cmt. (1992). We have *625 found that Schlei was not personally or substantially involved in petitioners' criminal defense. Petitioners made their motion to disqualify Schlei only 2 weeks before the trial in this case, even though Schlei was assigned to work on this case more than 2 months before trial. Motions to disqualify opposing counsel are subject to strict judicial scrutiny because of the cost and inconvenience they may impose on the judicial system and the party whose attorney is disqualified. Optyl Eyewear Fashion Intl. Corp. v. Style Cos., 760 F.2d 1045, 1050 (9th Cir. 1985); Duffey v. Commissioner, 91 T.C. 81, 84 n.2 (1988); preamble to the Model Rules (Model Rules should not be used as a procedural weapon). Motions made on the eve of trial are subject to particular scrutiny because they may be a tactical move to disadvantage the other party. Duffey v. Commissioner, supra.
Petitioners' motion would have placed respondent and the Court at a significant disadvantage. When petitioners filed their motion, respondent had invested almost 1 year in preparing for trial and the deadline for discovery had expired. *626 In addition, Schlei had worked on this case for 2 months and coauthored respondent's pretrial memorandum. Petitioners did not address the application of the Model Rules in their motion, even though practitioners in the Tax Court must conduct their practice in accordance with the Model Rules. Rule 201(a). Three days after they filed their motion to disqualify Schlei, petitioners filed a motion to continue the trial until the motion to disqualify was decided. We believe that petitioners made the motion primarily as a delay tactic. If we had known earlier of this issue, the parties and Court would have had more ways to respond to it. Respondent may well have chosen to assign different counsel at an earlier stage to keep this issue from reaching this point. However, respondent was under no obligation to reassign this case at the time petitioners filed this motion shortly before the trial. For the foregoing reasons, we reaffirm our pretrial ruling that neither Schlei nor other attorneys in the office of the Des Moines, Iowa, District Counsel are disqualified from participating in this case. 2. Net Worth
Respondent used the net worth and personal living expenditures method *627 to calculate petitioners' income for the years in issue because petitioners' books and records were inadequate. Under the net worth method, respondent computes income by calculating a taxpayer's net worth at the beginning and end of a year. The difference is increased by adding nondeductible expenditures, including living expenses, and by subtracting nontaxable items such as gifts, inheritances, loans, and the like. Holland v. United States, 348 U.S. 121, 125 (1954); Cefalu v. Commissioner, 276 F.2d 122, 126 (5th Cir. 1960), affg. T.C. Memo. 1958-37. An increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, may be considered taxable income. Holland v. United States, supra;Cefalu v. Commissioner, supra.
In a net worth case, respondent must: (a) Establish, with reasonable certainty, an opening net worth, and (b) either (i) show a likely income source, or (ii) negate possible nontaxable income sources. Holland v. United States, supra at 132-138; Smith v. Commissioner, 926 F.2d 1470, 1479 (6th Cir. 1991), *628 affg. 91 T.C. 1049 (1988); Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Where respondent has determined opening net worth with reasonable certainty, taxpayers bear the burden of showing the determination is erroneous. Denison v. Commissioner, 689 F.2d 771, 773 (8th Cir. 1982), revg. T.C. Memo. 1981-738. Petitioners allege that respondent improperly applied the net worth method for 1984, 1985, 1986, and 1987 because respondent: (a) Incorrectly valued petitioners' guns; (b) incorrectly valued petitioners' coins; (c) incorrectly calculated petitioners' net deferred gain on real estate sales; and (d) failed to negate all nontaxable sources of income. Petitioners rely heavily on their own testimony to show that respondent did not reasonably apply the net worth method. We may not arbitrarily disregard competent, credible testimony. Banks v. Commissioner, 322 F.2d 530, 537 (8th Cir. 1963), affg. in part, revg. in part T.C. Memo. 1961-237. *629 However, we do not have to accept testimony that is improbable, unreasonable, or questionable. Id. We are not required to accept uncorroborated testimony of taxpayers about their net worth. Gatling v. Commissioner, 286 F.2d 139, 143-144 (4th Cir. 1961), affg. T.C. Memo. 1959-224. Contentions by taxpayers who try to benefit from the fact that they kept poor records are subject to particular scrutiny. Schroeder v. Commissioner, 291 F.2d 649, 653 (8th Cir. 1961), affg. T.C. Memo. 1957-162; Toms v. Commissioner, T.C. Memo. 1992-125. We found much of petitioners' testimony to lack credibility. Their testimony was inconsistent with financial statements they prepared before they were charged with tax fraud. For example, petitioners testified that petitioners owned many more guns than they listed on their financial statements. In their Response to Motion to Court Order to Show Cause under Rule 91(f), petitioners valued their guns at $ 49,000, $ 39,000, $ 24,500, and $ 18,500. These values are inconsistent with their financial statements *630 and with the value of the guns that they now contend that they owned during the years in issue. Mary Harker testified that petitioner was in charge of their finances and investments, yet she bought the lots on which they built houses in Laredo and signed all of the documents for the house sales that they financed. Petitioner explained his suspicious behavior by claiming that someone told him to do it or by asserting that his behavior could be explained by documents that he did not produce. For example, he claimed that he did not report income from the sale of merchandise because an employee of his accountant and an IRS agent told him that it was not necessary. He testified that he gave respondent a list of all of the guns in his collection in 1980 that respondent did not return, but petitioners do not claim that respondent failed to give them anything they requested. Finally, petitioner pleaded guilty to tax evasion for 1987 and Mary Harker pleaded guilty for tax evasion for 1985. Baum v. Commissioner, T.C. Memo. 1958-96. For the following reasons, we hold that respondent correctly applied the net worth method. a. Guns
Respondent contends *631 that petitioners' yearend gun inventory was $ 19,344.85 in 1984, $ 25,714.89 in 1985, $ 28,100.46 in 1986, and $ 23,316.84 in 1987. Respondent's position was based on the following documents seized when petitioners' home was searched in November 1988: (i) Invoices for petitioners' gun purchases; (ii) the logbook of guns petitioner bought and sold as a licensed dealer (ATF logbook); and (iii) ATF Forms 4473 that petitioner prepared for guns he sold. There were 12 guns listed in the ATF logbook for which respondent could not find source documents. Respondent concluded that those guns had a cost basis of zero. [6] There were 13 guns in the ATF logbook that petitioner listed as transferred to himself that petitioner testified became part of his personal collection and for which there exists no further record. Respondent did not include in the gun valuation: (i) The 13 guns in the ATF logbook that petitioner transferred to his personal collection, or (ii) invoices for accessories such as holsters and ammunition that petitioner had bought. *632 Petitioners contend that the values of petitioners' gun inventories for December 31, 1984, 1985, 1986, and 1987 were $ 130,000, $ 93,000, $ 56,000, and $ 19,500, respectively. Petitioners argue that their calculation of gun inventories should be used and that respondent's failure to include the value of the 25 guns and gun accessories was not reasonable. Petitioners also argue that respondent's conclusion that petitioners' gun inventories increased during the years in issue was not reasonable because petitioner's memo to Hambrick stated that petitioner was reducing the size of his gun collection. Finally, petitioners argue that petitioner had a personal gun collection in addition to the guns he owned as a firearms dealer which respondent did not consider. We first consider petitioners' contention that respondent unreasonably excluded 25 guns and gun accessories from petitioners' net worth. Petitioner testified that he had no documentary evidence of the cost of the omitted guns other than what he gave to respondent. Petitioners do not suggest a value for the 12 guns with no source documents or explain whether petitioner kept or sold the 13 guns after he transferred them to his *633 personal collection. Petitioners argue that respondent could have accounted for the 25 guns more accurately if respondent had inventoried petitioners' guns when respondent searched petitioners' house in 1988. Petitioners' attempt to shift the blame to respondent is disingenuous. Respondent could not determine the value of the 25 guns because petitioners failed to keep records for the guns. Petitioners could have taken an inventory of the guns in 1988 but did not. Because petitioners are responsible for the uncertainty of the value of the 25 guns, we hold that respondent reasonably accounted for the 25 guns. Schroeder v. Commissioner, supra;Toms v. Commissioner, supra.
Petitioners have not presented any evidence to indicate the value of gun accessories respondent did not consider. The only evidence of purchases of gun accessories is for items of negligible value, such as ammunition. In addition, even if we accepted petitioners' claim that petitioner owned gun accessories such as gun cabinets and bullet proof vests on December 31, 1984, this would not affect petitioners' understatement of taxable income unless petitioners *634 used the assets to purchase additional assets, decrease liabilities, or pay for personal living expenditures during the years in issue. Singleton v. Commissioner, T.C. Memo. 1977-98, affd. per curiam 606 F.2d 50 (3d Cir. 1979). Petitioners do not argue that they used these gun accessories for these purposes. Thus, it was reasonable under the circumstances for respondent not to include gun accessories in calculating petitioners' net worth. We next consider petitioners' assertion that they reduced their gun inventory during the years in issue. Petitioners rely on a memo petitioner wrote to Hambrick in which petitioner said that he got cash by reducing the size of his gun inventory. We are not convinced that petitioners were selling their guns because the documentary evidence respondent used to value petitioners' guns shows an increase in the number of guns that petitioners owned during the years in issue and because petitioners did not offer any evidence of gun sales respondent did not consider. We conclude that respondent reasonably concluded that petitioners' gun inventories increased during the years in issue and that *635 gun sales were not petitioners' real source of cash. Petitioners contend that petitioner had a large number of personal guns that respondent did not consider. To support this theory, petitioners rely on the 1980 Summary that petitioner prepared which listed guns and coins petitioners purportedly owned in 1980. Petitioner testified that he did not have source documents to support his estimate of the cost basis of his personal gun collection, but that he kept track of it by making notations on the boxes in which he stored the guns, on the guns, or by relying on his memory. Petitioners estimate that their gun and accessory inventory increased from $ 110,000 in 1980 to $ 130,000 on December 31, 1984. Petitioners were unsure about how many guns they sold each year, so they estimated that their gun inventory decreased by the same amount during each of the years in issue. We give little or no weight to the 1980 Summary. Respondent's calculation was made by reviewing all existing source documents and petitioners' records. The 1980 Summary has no supporting documentation and was dated 5 years before the years in issue. Although petitioner testified that he prepared the 1980 Summary *636 in 1980, we believe petitioner prepared it in 1986. Petitioner had training in net worth analysis, his superiors questioned his finances in 1986, and he reported gun inventories on the 1980 Summary far greater than petitioners reported on financial statements they prepared before and during the years in issue. Petitioners claim that they did not include guns they kept for personal use on their financial statements. We find this argument unpersuasive. Petitioners have not presented any independent evidence, such as invoices, to prove that any guns respondent did not consider existed. If petitioners had had guns worth $ 130,000 in 1984, we believe petitioner would have included them as an asset on the financial statement he prepared in August 1984, to get a loan. We doubt petitioners' claim that the reason they did not include personal guns on their financial statement is that they were not business assets because they reported other personal assets on the statements. Petitioner's friend and one of his coworkers testified that they saw many guns at petitioners' house in the late 1970s or early 1980s. However, they could not remember exactly when they observed petitioners' guns *637 or how many guns they saw. Mary Harker testified that petitioner had "hundreds and hundreds" of guns. We found Mary Harker's testimony to be vague, self-serving, and unreliable in view of the lack of corroborating documentary evidence. Petitioner testified that he gave respondent a list of 130 guns that he owned in 1980. We are not convinced by petitioner's claim that he had a list of 130 guns because no such list was introduced into evidence and petitioner conceded that respondent did not fail to respond to any informal discovery requests. Because respondent reasonably accounted for the evidence relating to petitioners' gun inventory, and because petitioners have not produced any convincing evidence that they had or sold additional guns, we hold that respondent correctly valued petitioners' gun inventories for the years in issue. b. Coins
Respondent contends that petitioners' coin inventory was zero on December 31, 1984, because respondent saw no documents showing that petitioners owned any coins on that date. Respondent asserts that petitioners' yearend coin inventory was $ 10,170 in 1985, $ 30,906.70 in 1986, and $ 30,906.70 in 1987. Respondent's calculations were *638 based on invoices from a coin store called Security Rare Coin, documents seized from petitioners' residence, documents obtained through subpoenas, and the stipulations in this case. Petitioners did not have documents showing that petitioners had more coin inventories than respondent calculated. Petitioners contend that respondent did not reasonably value their coin inventories for the years in issue because respondent failed to consider the inventory of coins other than gold coins that petitioners claim they had. Petitioners contend that their yearend coin inventory was $ 23,250 in 1984, $ 15,250 in 1985, $ 5,000 in 1986, and $ 4,500 in 1987. Because petitioners did not have source documents for coins other than gold coins, they estimated their coin inventory for each year, using the 1980 Summary as a starting point. We give little weight to the 1980 Summary because it is a self-serving document prepared by a person trained in the net worth method, it is dated 5 five years before the years in issue, and it contains only summary information without documentary corroboration. Petitioners contend that the fact that petitioner had collected coins for many years, and the fact that *639 petitioners had 22 rolls of coins in their home in 1988, shows that petitioners had coins in December 1984. However, petitioner did not list coins as an asset on the financial statement he prepared in August 1984. Petitioner claimed that he did not list coins as an asset on the 1984 financial statement because it was not a complete statement of his assets and liabilities and that he only included enough assets to qualify for the loan for which he was applying. Petitioners argue that the fact that they had income from coin sales during the years in issue shows that they had coins in 1984. Respondent concedes that petitioner sold none of the coins he bought from Security Rare Coin and Bullion Corp. during the years in issue but argues that petitioner could have bought these coins in the same year that he sold them. Even if petitioners had coins in 1984, we are not convinced that they had any significant value. Petitioner collected common coins and gold coins. He sold his dimes and nickels for $ 500 in 1987. Petitioners have provided no basis for us to decide the value of their coin inventory on December 31, 1984. Thus, we hold that respondent's valuation of petitioners' coin *640 inventories during the years in issue is reasonable. c. Net Deferred Gain on Real Estate Contracts
Petitioners used the installment method to report sales of the houses they built. The only issue relating to these sales is the amount of petitioners' net deferred gain for the years in issue. Respondent contends that petitioners' basis in three of the houses should be increased by the amount of commissions that respondent contends petitioners paid Gomez. If petitioners' total basis in the houses were higher, their net worth would be larger and thus their tax liability would be greater. These three houses were located at 104 Fairway Lane, 106 Country Club Court, and 110 Clubview Drive. Petitioners assert that they did not pay Gomez commissions for the three houses. Gomez testified that petitioners paid him a total of $ 13,485 in commissions on those three houses. Gomez testified that $ 5,000 of that amount was a commission on the house at 104 Fairway Lane that he used to repay some of the money he owed petitioners. Petitioners sold the house at 104 Fairway Lane to a couple named Gonzales. Petitioners offered into evidence receipts that Gomez signed for less than $ 50,000 *641 of the more than $ 300,000 that petitioners paid him. Gomez' testimony that petitioners paid him $ 5,000 as a commission for the house at 104 Fairway Lane is supported by the receipt petitioner wrote when Gomez paid $ 5,000 on the loan. Petitioner wrote on the receipt "Funds from fee ref. Gonzales house." We believe that petitioner's notation meant that Gomez used his commission for the Gonzales house to partially repay his loan from petitioners. Petitioners offered no evidence other than their own testimony to show that they did not pay Gomez commissions on three of the seven houses he built. Gomez' testimony was more credible than petitioners', particularly since Gomez did not have a motive to testify that he received income that he did not receive. Although Gomez was being audited by respondent at the time of trial, petitioners do not contend on brief, and we do not believe that this affected Gomez' testimony. We hold that respondent's calculation of petitioners' net deferred gain is correct. d. Likely Sources of Income
In a net worth case, respondent must either show a likely source of income or negate possible nontaxable sources of income. Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), *642 affd. 926 F.2d 1470 (6th Cir. 1991); Brooks v. Commissioner, 82 T.C. at 431-432. Petitioners had income from the sale of guns, coins, and electronic products during each of the years in issue but reported income from none of these except electronic products in 1986. Respondent has shown that merchandise sales are a likely source of petitioners' unreported income. e. Respondent Negated Nontaxable Sources of Income
Respondent must adequately investigate all leads presented by the taxpayer which are reasonably susceptible of being checked. Holland v. United States, 348 U.S. at 135-136. A taxpayer who offers no leads or leads not reasonably susceptible of being checked cannot complain about the sufficiency of an investigation. United States v. Penosi, 452 F.2d 217, 220 (5th Cir. 1971); Blackwell v. United States, 244 F.2d 423, 429 (8th Cir. 1957). Respondent did not include in petitioners' net worth a $ 230,000 loan which petitioners assert they received in 1986 from a Mexican citizen named Martinez. Petitioners assert that *643 respondent failed to adequately investigate leads to disprove the existence of the loan. Petitioners contend that from March to September 1986, Martinez lent Mary Tyler money to use in their construction business, and that they repaid the loan in 1988. Petitioners argue that the following documents and events support their claim that Martinez lent them money: (a) The promissory notes that Mary Harker signed; (b) the notes petitioner sent Terry referring to his "loan man"; (c) petitioners' $ 75,000 loan to Terry; and (d) Terry's $ 75,000 deposit to the Harker-Terry partnership. Petitioners claim that the fact that these transactions occurred closely together shows that Martinez lent them money that petitioner sent to Terry to use in their investments. We disagree. For the following reasons we conclude that petitioners did not have a loan from Martinez. Petitioner had training in net worth analysis. We believe that he manufactured a nontaxable source of income after his superiors became suspicious of his cash transactions. [7] Petitioners' transactions with Terry total $ 150,000, not $ 230,000. Even if the money petitioners gave Terry was from Martinez, there is no convincing *644 evidence that it was a nontaxable loan. There is no evidence that this amount was ever deposited in any of petitioners' bank accounts. Petitioners did not list a loan from Martinez on any of their financial statements. Mary Harker testified that she has no personal knowledge that Martinez gave petitioner money or that petitioner repaid the loan. Petitioner testified that Martinez made several payments to him of $ 8,000 to $ 10,000, but petitioner could not remember the dates or exact amounts of the payments or if he first deposited them in his bank account before he sent them to Terry. Petitioners did not deduct interest on a loan from Martinez on any of their tax returns for the years in issue. Petitioner claims he told Martinez that he would not be able to pay interest for a while but does not explain why Martinez did not insist on interest payments. Martinez did not testify at trial. *645 Petitioner claims that he repaid the loan in 1988 and that his former attorney has the canceled notes; however, petitioners did not offer the notes into evidence or call their former attorney to testify. The failure to call a witness may give rise to the presumption that, if called, the witness would testify unfavorably. Recklitis v. Commissioner, 91 T.C. 874, 890 (1988); Davis v. Commissioner, 88 T.C. 122, 143 (1987), affd. 866 F.2d 852 (6th Cir. 1989); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). When petitioner's superiors asked him the source of his cash, he did not claim that he had a $ 230,000 loan, even though the transaction about which they were suspicious was the $ 75,000 loan to Terry, the source of which petitioners now claim was the Martinez loan. Petitioners claim that the fact that petitioner told his superiors that he was investing in real estate with Mary Harker shows that he told the DEA about the loan. We disagree because none of petitioner's memos *646 about the DEA's inquiry mention either a loan or Martinez. Petitioner claims that he told the DEA that he had borrowed money from Martinez. However, petitioners did not call anyone to corroborate this contention. We conclude that petitioner did not tell the DEA about the loans from Martinez. Petitioners argue that their financial statements do not disprove the existence of the loan for two reasons. First, they argue that petitioner did not include the loan on the financial statements he prepared because Mary Harker was liable for the loans. We are not convinced by this claim because petitioner included some of Mary Harker's assets, such as cars, on his statements, and Mary Harker did not include the loan on the financial statement she made in January 1987. We view these as evasions, not explanations. Second, petitioners claim that the $ 230,000 liability on the December 1987 financial statement that petitioner prepared for Mary Harker is the liability to Martinez. We do not believe that this financial statement proves that there was a loan because we believe that petitioner prepared the financial statement in anticipation of this case after the DEA questioned his finances *647 in 1986. Petitioner did not prepare this statement to qualify for a loan. It appears that petitioner prepared it in haste because it was typed on the back of a map. Further, the Federal agents did not seize this statement during the search of petitioners' home. Thus, we do not believe that petitioner prepared it in 1987. Petitioners contend that petitioner prepared the December 1987 statement to give to some people with whom they were contemplating entering a new real estate venture. We do not believe this explanation because the statement lists only two asset categories and omits others such as guns, coins, and stock investments. The statement lists large liabilities. We do not believe that petitioners would have submitted such an unfavorable financial statement if they wanted to enter a real estate venture, particularly since petitioner prepared self-serving financial statements to obtain loans. Petitioners did not offer any leads which were reasonably susceptible of being checked by respondent that would show they had a loan from Martinez. Petitioners gave respondent the address of a business in Laredo at which Martinez might be found, but Martinez was not there. Petitioners *648 did not give respondent a telephone number, home address or city where respondent could find Martinez. At trial, petitioner claimed for the first time that Martinez lived in Monterrey, Mexico. Thus, respondent did not have a reasonable opportunity to investigate this lead. Donlan testified that Juan Martinez is a common name that is nearly impossible to investigate without some specific information. Petitioners argue that they did not search for Martinez to testify because petitioner could not go to Mexico. Petitioners do not explain why someone else could not look for Martinez. Petitioners argue that respondent did not adequately investigate leads because respondent's agent did not recall interviewing Gomez. We disagree. Gomez signed an affidavit in which he said that petitioner introduced him to Martinez in 1986 and told him that Martinez had lent petitioner money. At trial, Gomez testified that his affidavit was wrong and that petitioner did not tell him about the Martinez loan until after Federal agents searched petitioners' home. As discussed, we found Gomez to be a credible witness. We believe that petitioner told Gomez about Martinez after petitioners' house was *649 searched in order to substantiate petitioners' claim that Martinez loaned them money. Thus, if respondent's agent had interviewed Gomez, it would not have been persuasive evidence that a loan existed. We conclude that leads provided by petitioners were not reasonably susceptible of being checked any more than respondent did, and that petitioners did not receive a $ 230,000 nontaxable loan from Martinez. [8]
f. Conclusion
Respondent reasonably concluded that petitioners' opening net worth showed likely sources of taxable income and negated sources of nontaxable income. Petitioners offered no persuasive *650 evidence that respondent's position was incorrect. We conclude that respondent correctly applied the net worth method for 1985, 1986, and 1987. 3. Additions to Tax for Fraud Under Section 6653(b)
a. Background
Respondent determined that petitioners are liable for additions to tax for fraud for 1985, 1986, and 1987. Section 6653(b)(1) and (2) applies to tax years before 1986. Under section 6653(b)(1), if respondent proves that any part of the underpayment is attributable to fraud, an addition to tax applies to the entire underpayment, regardless of whether petitioners show that some part is not attributable to fraud. Sec. 6653(b)(1). Section 6653(b)(1)(A) and (B) applies to tax years after 1985. Under these sections, if respondent establishes that a portion of the underpayment is attributable to fraud, the additions to tax do not apply to any part of the underpayment that petitioners can show is not attributable to fraud. Sec. 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). First, respondent must prove the existence of an underpayment. Parks v. Commissioner, 94 T.C. 654, 660 (1990). *651 Respondent may not rely on the taxpayer's failure to carry the burden of proof as to the underlying deficiency. Parks v. Commissioner, supra at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Second, respondent must show that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Petitioner pleaded guilty to tax evasion for 1987 and Mary Harker pleaded guilty to tax evasion for 1985. Petitioners argue that they are not collaterally estopped from denying fraud for the years for which they pleaded guilty. Petitioners contend that petitioner is not collaterally estopped from denying fraud for 1987 because the plea agreement stated that petitioners reserved the right to "contest any civil penalty and/or interest which may *652 be assessed by the Internal Revenue Service on the 1987 calendar year for taxes and to contest the amount of taxes, penalty and interest * * * for the 1985 and 1986 calendar years." Petitioners argue that the absence of the phrase "the amount of" means that petitioner reserved the right to contest the issue of fraud for 1987. Petitioners also assert that respondent cannot rely on collateral estoppel because petitioners claim that respondent was not in privity with the parties in the criminal suit. We reject petitioners' arguments. In any event, for the following reasons, we conclude that respondent has proved that both petitioners are liable for fraud for each year in issue even apart from collateral estoppel, and petitioners have not shown that any part of their underpayments for the years 1986 and 1987 were not attributable to fraud. b. Underpayment
Respondent may prove the existence of an underpayment by proving a likely source of the unreported income, Holland v. United States, 348 U.S. at 137-138; Parks v. Commissioner, supra at 661, or, if the taxpayer alleges a nontaxable source, by disproving the alleged *653 nontaxable source. United States v. Massei, 355 U.S. 595 (1958). Respondent followed all reasonable leads relating to the purported Martinez loans and also showed likely sources of taxable income. Petitioners agree that they underreported their taxable income by $ 8,064 in 1985, $ 89,589 in 1986, and $ 643,029 in 1987. We conclude that respondent has proven by clear and convincing evidence that petitioners underpaid their income taxes for the years in issue. c. Fraudulent Intent
Once respondent has established that a portion of petitioners' underpayment for years after 1985 was attributable to fraud, the entire amount of the underpayment is subject to section 6653(b) unless petitioners can show that some part of the underpayment was not due to fraud. Petitioners have not shown that any parts of their underpayments for 1986 and 1987 were not attributable to fraud. In addition, we find that respondent has established that all of the underpayment for 1985 is attributable to fraud. We conclude that the entire amount of the underpayment for 1985, 1986, and 1987 is subject to the additions to tax for fraud. Respondent must prove by clear and *654 convincing evidence that petitioners had fraudulent intent. Parks v. Commissioner, supra at 664. For purposes of section 6653, fraud means "actual, intentional wrongdoing", Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud may be proven by circumstantial evidence (including the implausibility of the taxpayer's explanations), Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court because direct evidence of the taxpayer's intent is rarely available. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). *655 Fraud is not imputed from one spouse to another; respondent must prove fraud separately for each spouse. Sec. 6653(b); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner, 56 T.C. 213, 227-228 (1971), affg. T.C. Memo. 1969-48. The courts have developed a number of objective indicators or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. at 910. There are several badges of fraud present in this case: (i) Large understatements of income, (ii) inadequate records, (iii) failure to supply complete information to return preparer, (iv) dealings in cash, and (v) implausible or inconsistent explanations of behavior. Bradford v. Commissioner, supra at 307-308; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971). i. Large Understatements of Income
A pattern of consistent underreporting of income for several years, especially when there are discrepancies of 100 percent or more between actual net income and *656 net income reported on tax returns, is evidence of fraud. Holland v. United States, 348 U.S. at 137-139; Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37; Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue T.C. Memo. 1965-246; Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). Petitioners underreported their income for the 3 years in issue. The fact that petitioners amended their tax returns to report some additional income after they were criminally charged does not show that petitioners did not originally file fraudulent returns. Badaracco v. Commissioner, 464 U.S. 386, 394 (1984); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Niedringhaus v. Commissioner, 99 T.C. 202, 213 (1992); Miller v. Commissioner, 94 T.C. 316, 337 (1990). *657 This factor indicates fraud. Goldberg v. Commissioner, 239 F.2d 316, 321 (5th Cir. 1956), revg. and remanding T.C. Memo. 1954-242. ii. Inadequate Records
A taxpayer's failure to maintain accurate records is a badge of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958). Petitioners concede that they kept poor records during the years in issue. We believe that petitioners did so in part to hide their suspicious activities. Petitioner told his family members that they would not need to report the profit from gold coins because he did not keep records for the gold coins. Petitioners assert that petitioner meant to tell Mary Harker that they had a loss on the coins. We disagree; we believe that petitioner's statement shows that he was trying to avoid taxation on income from the coins. Mary Harker knew that petitioner was selling merchandise at their home and sold some guns for *658 him, but there is no evidence that she recorded any of these sales. We believe that petitioners' bad record keeping was a deliberate attempt to conceal their unreported income. iii. Incomplete Information to Tax Return Preparer
A taxpayer's failure to give complete information to his or her tax return preparer about the taxpayer's income and expenses may be a badge of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63. Petitioners knew that they had income from the sale of guns, coins, and electronic products in each year in issue. Petitioner did not tell Berend that petitioners had income from the sale of guns or coins in these years, and he only told Berend about $ 30,000 of the $ 530,800 of profits from electronics in 1986. Petitioner claims that, because he had rolled over a gain on the sale of a residence and because tax-free rollovers from IRA's are permitted, he believed that profits on the sale of houses petitioners built and sold and merchandise could also be rolled over. Petitioner also claims that an IRS employee and someone in Berend's office confirmed *659 his belief, but he presented no evidence to support that claim. We believe that no one told petitioner that those rollovers were permitted. In addition, rollovers of gains on the sale of residences and IRA's must be reported to the IRS whether or not they are taxable. Sec. 408(o)(4); sec. 1.1034-1(h)(2), Income Tax Regs. The last page of the booklet Berend sent petitioners asked the taxpayer to list any other nontaxable income not reported elsewhere in the booklet, yet petitioner did not advise Berend about the gains. Petitioners argue that the fact that they reported a $ 30,000 gain from the sale of electronic products that they used for personal expenses on their 1986 return shows that petitioner believed that he could roll over gains on the sale of merchandise. We disagree. Petitioners had cash transactions of more than $ 1 million during the years in issue, yet reported taxable income of less than $ 100,000 for those years. Petitioners clearly used more income from sales for personal expenses than $ 30,000 during the years in issue. A taxpayer's training, business experience, and knowledge of income tax laws are relevant in deciding whether a taxpayer committed fraud. *660 Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986). Petitioner had some knowledge of tax laws as shown by the fact that he disputed the way Berend treated some of petitioners' income on their tax returns. In addition, petitioner had training in the net worth method. Thus, we do not believe that petitioner genuinely thought he could roll over gains on the sale of merchandise. iv. Dealing in Cash
Petitioners contend that the fact that their cash transactions totaled more than $ 1 million during the years in issue, almost $ 1 million of which occurred in 1986 and 1987, does not indicate fraud because it was common to use cash in Laredo, Texas. However, in 1987 petitioner mailed and Mary Harker delivered cash to relatives in Iowa. Petitioner concealed his use of cash by declaring packages that contained thousands of dollars were worth nothing. Petitioners also argue that petitioner used cash because he did not want anyone at his bank to tell the FBI about his financial dealings. We believe this is *661 a tacit admission of petitioner's fraudulent intent. We hold that petitioners' use of cash is a badge of fraud for 1986 and 1987, but not 1985, since petitioners' cash transactions during that year only totaled $ 10,170. v. Implausible or Inconsistent Explanations
We found that petitioners' claims that they had a loan from Martinez and a hoard of personal guns were implausible. When his supervisor at the DEA became suspicious of his cash transactions, petitioner did not mention his supposed $ 230,000 loan. The gun inventories petitioners included on their financial statements were significantly less than the gun inventories petitioners now claim that they owned during the years in issue. We believe that the fact that petitioners prepared financial statements to obtain loans, but did not include gun inventories that would have been one of their largest assets, tends to show that they did not have the gun inventories they claim. As discussed, we did not believe petitioners' claim that they did not report their income from the sale of merchandise because petitioner thought, and persons with an accounting firm and the IRS told him, that he could roll over these gains. Petitioners *662 explain their inability to prove that they repaid the purported $ 230,000 loan to Martinez by claiming that their prior attorney has copies of the canceled notes. Petitioners did not call this attorney as a witness. Petitioners contend that petitioner had a large collection of guns and that their contention is supported by a list of guns petitioner claims he gave to respondent. Petitioner acknowledged that respondent complied with their discovery requests. We believe that petitioners fabricated these explanations. d. Conclusion
We conclude that respondent has proven fraud by clear and convincing evidence for both petitioners for all the years in issue. We hold petitioners are both liable for additions to tax for fraud for 1985, 1986, and 1987. 4. Substantial Understatement of Tax Under Section 6661
Respondent determined that petitioners are liable for the addition to tax for substantial understatement of income tax under section 6661. If assessed after October 21, 1986, the addition is 25 percent of any underpayment attributable to the understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial *663 understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). Respondent may waive this addition to tax if the taxpayer had reasonable cause for the understatement and acted in good faith. Sec. 6661(c). Petitioners concede that they substantially understated their income for 1985, 1986, and 1987, but they argue that respondent should waive the addition to tax because they contend that the understatements were due to petitioner's good faith misunderstanding of the law. Petitioners contend that their income was substantially understated because they rolled over gains on the sale of guns, coins, and electronics upon the advice of someone at Berend's firm and an unidentified IRS employee. We do not believe that claim. Because petitioners did not have reasonable cause or act in good faith, respondent was not required to waive this addition to tax. Petitioners raised no other defense. We hold that petitioners are liable for the addition to tax under section 6661. To reflect the foregoing, An appropriate order will be issued and decision will be entered under Rule 155. Footnotes
1. Fifty percent of the interest due on $ 15,937.92.↩
2. Fifty percent of the interest due on $ 168,991.53.↩
3. Fifty percent of the interest due on $ 245,856.45.↩
1. Fifty percent of the interest due on $ 20,070.↩
2. Fifty of the interest due on $ 193,871.↩
3. Fifty percent of the interest due on $ 265,676.↩
1. On their 1985 amended return, petitioners reported an additional $ 5,000 of income from computers and/or coins.↩
2. These findings of fact are based on the uncontroverted pretrial affidavit of Jeffrey Schlei, dated Oct. 7, 1993.↩
3. Both of these cases were overruled on other grounds in In re Multi-Piece Rim Prods. Liability Litigation, 612 F.2d 377 (8th Cir. 1980), vacated and remanded Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368 (1981). The issue in In re Multi-Piece Rim was the appealability of an order granting or denying a motion to disqualify counsel. In re Multi-Piece Rim did not overrule State of Ark. v. Dean Foods Prods. Co., 605 F.2d 380 (8th Cir. 1979) or Fred Weber, Inc. v. Shell Oil Co., 566 F.2d 602↩ (8th Cir. 1977) on the merits of these cases.
4. Rule 1.6 of the Model Rules of Professional Conduct (1992) provides that, in general, lawyers may not reveal or use confidential information relating to their representation of a client.↩
5. The Model Code of Professional Responsibility does not contain a counterpart to Model Rule 1.11(c).↩
6. Four of the twelve guns which respondent determined had a zero cost basis were sold in the years in issue, one in 1985 and three in 1987. There is no evidence whether the other eight guns were sold.↩
7. The parties dispute whether the notes from Mary Tyler to Martinez were taken from a drawer in petitioners' house or whether petitioner handed the notes to Donlan during the search. Petitioner had ample time from 1986 when petitioners' finances were first questioned, to 1988 when the search occurred, to falsify a nontaxable source of income, and we believe that he did so. Thus, the means by which the notes were seized is irrelevant.↩
8. Petitioners claim that petitioner repaid the $ 230,000 loan to Martinez in 1988. Thus, petitioners contend that it is improper to include the $ 230,000 in their net worth because it creates a double taxation that could have been avoided if respondent had included the year 1988 in respondent's investigation. We need not reach this argument because we find that petitioners did not receive a loan from Martinez.↩